

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

### NO. AP-77,031

**FRANKLIN DAVIS, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON DIRECT APPEAL FROM CAUSE NO. F12-12630-Y IN CRIMINAL DISTRICT COURT NO. 7 DALLAS COUNTY

KEASLER, J., delivered the opinion of the Court, in which KELLER, P.J., and MEYERS, JOHNSON, HERVEY, RICHARDSON, YEARY, and NEWELL, JJ., joined. ALCALA, J., concurred.

### O P I N I O N

On November 12, 2013, a jury convicted Franklin Davis of capital murder for the September 2012 murder of Shania Gray in the course of committing or attempting to commit obstruction.[1]  Pursuant to the jury's answers to the special issues set forth in Texas Code of

---

[1]  TEX. PENAL CODE § 19.03(a)(2).

Criminal Procedure Article 37.071, §§ 2(b) and 2(e),[2] the trial judge sentenced Davis to death.[3] Direct appeal to this Court is automatic.[4] Davis raises forty-eight points of error. After reviewing Davis's points of error, we find them to be without merit. Consequently, we affirm the trial court's judgment and sentence of death.

In his eleventh and twenty-fourth points of error, Davis challenges the legal sufficiency of the evidence to support his conviction and the jury's affirmative answer to the future dangerousness special issue. We shall address these claims first. The remaining points of error will be addressed in the order presented in his brief.

## STATEMENT OF FACTS

In September 2010, when Shania Gray was fourteen years old, her mother, Sherri Gray-James, arranged a babysitting job for her at the request of an acquaintance named Jennifer Dibrell. Gray began babysitting Dibrell's three children after school. One of those three children was Davis and Dibrell's daughter, Dezire. Gray-James would drop Gray off at Dibrell's apartment each time she was scheduled to babysit. In March 2011, Gray-James noticed some text messages on Gray's phone from a person named "Wish." Gray-James had met Davis and knew that "Wish" was his nickname. In one of the text messages, Wish asked Gray why she was not coming to babysit anymore. In another message, Wish stated, "That's

---

[2] *See* TEX. CODE CRIM. PROC. art. 37.071, § 2(g).

[3] *Id.* art. 37.071, § 2(g).

[4] *Id.* art. 37.071, § 2(h).

foul. So I'm supposed to sit around and wait? Man. Whatever." Gray responded, "Nope. You['re] getting mad for what? You got two for the price of one. What [are] you complaining for? Tryna [sic] have your cake and eat it too." Davis answered, "Just want you but can't fully have you yet." When Gray-James asked Gray about the messages, Gray became very upset and began crying.

Gray-James then drove to Dibrell's apartment with Gray and showed Dibrell the messages. Dibrell called Davis and told him that Gray-James was upset about the text messages. Gray-James felt that Dibrell reacted in a "nonchalant" manner, and she demanded to speak with Davis herself. Dibrell instructed her to call him the next day. When Gray-James sent Davis a text message the next morning, he responded that Gray was lying. He claimed that, when he sent the messages to Gray, he thought that someone was playing a prank with the phone and did not know he was corresponding with Gray. Gray-James told Davis that he was the liar and she would go to the police.

Davis preemptively called the police himself. He told the responding officer that, when Gray texted him, he did not know who it was and he "did not know Shania had a cell phone." He said that he was just "playing around" with an unknown correspondent. However, in a later interview with Detective Brandon Snyder, Davis changed his story and admitted he knew he was corresponding with Gray. He said that his text message to Gray, stating that he wanted her, was really intended to inform her that she was "too young" and that was why he could not "see her."

The day after Gray-James talked to Dibrell, Gray was visibly upset and crying at school. She confided in two sisters who were her close friends. She told them that she had been babysitting and this "guy" started "messing with her, touching her and stuff like that." Gray told the older sister that the sexual encounters had started out "as a habit," but the man had gotten "rough" with her. She told her that he threw her on the bed, threatened her with a "[s]amurai sword," and told her "If you tell, I'm going to kill you and your family." The sisters convinced her to come home with them after school and tell their mother what had happened. Gray then revealed to their mother that she had been sexually assaulted multiple times while she was babysitting. Their mother convinced her that she needed to tell her own mother. Gray then told Gray-James about the sexual assaults.

Gray-James contacted the school resource officer at Gray's school, Horn High School. She also took Gray to the Mesquite Police Department and met with Detective Snyder. Subsequently, she took Gray to the Dallas Children's Advocacy Center (DCAC) for a videotaped interview and then to the Children's Medical Center for a physical examination.

In the DCAC interview, Gray described four separate sexual assaults in which Davis penetrated her vagina when she fourteen years old—three at Dibrell's apartment and one at Davis's apartment. Snyder obtained an analysis of the content of Gray's phone and discovered that she had Davis's birthday listed in her phone's calendar. He also viewed the text message exchange between Wish and Gray that had distressed Gray-James.

Later, Davis was arrested for sexual assault and began having scheduled court dates.

Gray was planning to testify against Davis in his trial. Several months passed, during which Gray's family prepared to move from Mesquite to Carrollton, Texas, and Gray started attending Hebron High School in Carrollton.

On September 6, 2012, Gray informed her mother that she was going to attend after-school tutoring for her physics class, and Gray-James planned to pick her up at school after the tutoring. During the tutoring session, Gray sent a text message to her mother telling her that she was almost done. Gray-James parked in front of the school at around 4:00 p.m. and waited for Gray, but Gray never came out to meet her. Gray-James called and sent text messages to Gray repeatedly. She went to a nearby Starbucks and used her laptop to try to locate Gray's phone with no success. She returned to the school and found that the physics classroom where Gray had gone for tutoring was locked and dark. She contacted the physics teacher, who stated that Gray had left tutoring when it ended at 4:15 p.m. A group of teachers and coaches helped Gray-James search the school and the nearby football stadium, but they found no sign of Gray.

Gray-James contacted the Hebron High School resource officer, Officer Forest Cole Langston. Officer Langston became very concerned when he spoke to the Horn High School resource officer and learned that Gray was the named victim on four sexual assault indictments and Davis was the defendant charged in those cases. Officer Langston reviewed surveillance footage showing that Gray had exited Hebron High School through a back door normally used by coaches. A still photo from a surveillance camera showed a gray Dodge

Stratus parked nearby. Further investigation indicated that this car matched the description of a vehicle owned by Davis's wife, Jawanna Arrington Davis (hereafter "Arrington").

Meanwhile, on the evening of September 6th, Davis picked Arrington up after work driving her Stratus. She noticed a strong smell of cologne in the car and wondered if Davis was trying to cover up the smell of a woman. They drove to the hospital because Davis said that he had injured his arm at the gym. However, he only waited about ten minutes and then left before seeing a doctor. They went home and took a bubble bath together. Arrington said Davis was being more affectionate than normal and they "were intimate" that night.

The missing person case was assigned to Detective Dena Williams of the Carrollton Police Department. Gray-James gave Williams access to Gray's cell phone records and the passwords to her social media accounts. Officers discovered that the phone number that Gray had communicated with immediately before and after she sent the last text message to her mother had a 903 area code. Gray-James did not recognize this number. Williams obtained call records for both Gray's phone and the 903 phone number.

Detective Snyder testified that he tried to determine who had purchased the phone with the 903 number but could not uncover this information. However, he determined that the 903 phone number had contacted another number on the day of Gray's disappearance. Officers called this number and discovered that it belonged to Shakeema Morsley, a coworker and friend of Arrington's. Morsley gave police full access to her phone and text messages. They discovered that the person using the 903 phone number had asked Morsley

to tell him where her new apartment was located. He had refused to tell Morsley his name, but provided hints to his identity. Based on the various contextual clues, Morsley deduced that this person was Davis. She refused to give him her new address.

Morsley also gave Arrington's phone number to Detective Williams. Williams called Arrington. Within a few minutes, Arrington handed the phone to Davis and he spoke with Williams. Williams told him she was investigating a missing child. Davis acted very concerned. Williams asked Davis if he knew anything about the 903 phone number. He denied any knowledge of it.

Officers conducted surveillance on Davis and Arrington's apartment and the Dodge Stratus, which was parked in the apartment complex parking lot. While officers were watching, Davis exited the apartment and began walking toward the officers. They handcuffed him for their safety because he was known to be a bodybuilder and to carry a pistol. They walked with him back to the apartment because he said his knees were hurting and mosquitoes were biting him. They removed the handcuffs and requested that he follow them to the police department to discuss Gray. Davis agreed to come with them and, accompanied by Arrington, he drove to the police department in the Dodge Stratus.

Williams interviewed Davis at the police department. Davis said that he felt that Gray had falsely accused him of sexual assault. He told Williams that he had text messages from Gray on his phone proving that she had lied about the sexual assaults. He denied having any knowledge of the 903 phone number or Gray's current location and denied having any recent

communications with Morsley.

While Davis was being interviewed, Arrington gave consent for the police to retain her Dodge Stratus for processing. Canine handlers brought a "cadaver dog" (trained to search for the scent of a decaying body) and a dog trained to alert to Gray's scent to the parking lot at the police station. Both dogs displayed a positive reaction to the Dodge Stratus. At some point after the interview with Williams, Davis was arrested on the basis of outstanding traffic ticket warrants.

Detectives Edward Teniente and Jeremy Chevallier also assisted with the investigation. They received cell phone tower data for Davis's T-Mobile phone, which showed that his phone was at or near Hebron High School at 4:01 p.m. on September 6th, which was around the time that Gray had disappeared. Davis indicated to officers at the jail that he wished to speak with detectives. Teniente and Chevallier brought Davis into an interview room and read him his *Miranda*[5] rights. In this interview, the detectives informed Davis about the cell tower data. Davis admitted that he had been speaking with Gray on the phone and recording their conversations to document discrepancies between what she said on the phone and what she said in the police reports. He continued to deny having had any contact with Gray on the day she disappeared. Davis was returned to the jail after this interview.

About an hour and a half later, Davis indicated that he wanted to talk to Detective

---

[5] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Chevallier again. Chevallier and Teniente retrieved Davis from the jail for a third recorded interview. They asked him if he remembered the rights Chevallier had read to him previously. Davis said he did and then stated:

> A lot of the information that y'all say y'all have, it's not correct . . . . Honestly, I felt like that with a lot of the information that you was [sic] saying to me, that I would have been able to, been able to walk but I wouldn't be able to live with myself because I done it [sic].

Davis admitted to the officers that he had met Gray at the high school in the parking lot on the day of the offense. He explained that, about two and one-half months before the day he met Gray at the school, he adopted a false identity and began communicating with Gray using a "go phone" with a 903 phone number. Davis had selected a young man's profile photo from Facebook that he thought Gray would like. He told Gray that this was a photo of him and his nickname was "D." Davis told Gray that he ("D") had seen her on Facebook and he was "looking for a new friend, someone to get to know." He assured her it was "nothing sexual." Davis told the officers that he used this "D" alias to have telephone conversations with Gray on the go phone and recorded those conversations using his T-Mobile phone.

Posing as "D," Davis persuaded Gray to trust him. He induced her to talk about the first time she had sex and other personal matters. She eventually talked about the sexual assaults. Davis insisted to the detectives that Gray's account to "D" of the sexual assaults was not the same as the account in the police report. He said that he felt he got what he "needed" for his trial from the recorded conversations with Gray. He told the officers that

he had not talked to Gray in a while, but then he decided he wanted to talk to her "face-to-face" and renewed contact with her on September 5th.

Davis recalled that, when Gray first saw him at the school on September 6th, she said, "Oh, shit." He said he reassured her that he was not going to hurt her and she got into the car with him voluntarily. He then drove to a park area. He asked her "why she [had] lied and said things that she did to get [him] in trouble." Davis said Gray responded that her "mama made her do it." He said, "I told her I had been sitting outside her house and my demons was [sic] weighing on me so bad to where I wanted to kill everybody in that house." He said that he called this part of him "Wish," which was "the dark side of me that I let go years ago."

Davis told the officers that he and Gray got out of the car at the park and started walking down a trail. He said that he was "trying to tell her how much she had fucked up [his] whole life with the lies that she told." He said they walked off the trail, and he pulled the gun out. He shot Gray, but he was not sure where he had hit her. She fell into the water. He said Gray lay in the water for a second, "trying to act like she was dead." He shot her again. He said she cried and said, "[W]hy Wish?" He said he threw her jacket down to her to get her out of the water. He explained: "I wanted to stop but . . . I felt like if I would have stopped she would have told what had happened . . . . So I told her to lay [sic] down on the grass. And she laid [sic] down on the grass . . . . I put my foot on her neck and I pressed down." Davis said Gray grabbed his leg for about three seconds, then let go. He said, "I asked her to forgive me." He then rolled her body into the water and left the park. He said

he drove out of the parking lot and then pulled back in because he wanted to go to help her, but he knew it was too late. He told the detectives that he was sorry for what he had done.

Detective Teniente asked Davis if he always carried a gun. He shook his head "no." Davis said he initially obtained the gun to use it on himself. He was not sure when he decided to use it on Gray. Davis said he threw the gun out the window while driving down the highway. He said he also threw Gray's cell phone and the go phone out the window. He said he left Gray's backpack with her body.

At the end of the interview, Gray agreed to accompany the officers to locate Gray's body. He rode with the officers in an unmarked vehicle. In the meantime, a bicycle officer had already found Gray's body floating in the Trinity River and found her backpack nearby. When Chevallier and Teniente asked Davis to take them "to where it happened," he led them to the place where the crime scene team was already in the process of recovering Gray's body. He also led them to the locations where he had thrown the gun into a pond, where he had thrown Gray's phone into another pond, and where he had disposed of his shoes in a sewer drain.

The autopsy revealed that Gray's body had undergone a substantial amount of decomposition while floating in the water. She had been shot once in the shoulder and once in the back. She had further suffered forceful asphyxia to her neck. The medical examiner recovered one bullet lodged in her body. The examiner ruled that the cause of Gray's death was homicidal violence, including the two gunshot wounds, asphyxia due to neck

compression, and possible drowning.

The police also located a Diamondback .380 pistol at the edge of a pond, Gray's phone in another pond, and Davis's shoes in a sewer drain, where Davis told them they would be. Davis's go phone was never found. A senior forensic scientist specializing in firearms testified that the Diamondback .380 pistol was compared to a bullet and two cartridge casings found near Gray's body, as well as the bullet recovered from her body. His analysis showed that the Diamondback .380 pistol fired the bullets and ejected the casings.

On September 9, 2012, after Detective Williams viewed the autopsy, she received a message that Davis wanted to speak with detectives again. In this fourth interview, Davis told them where he disposed of a soiled "Scarface" blanket from the car, the sweat pants he was wearing at the time of the shooting, and the magazine for his gun. He again described the killing and how he had contacted Gray using his go phone pretending to be a different person. Davis continued to insist that he had never had sex with Gray. He said, when he picked Gray up on September 6th, she told him she would tell the "truth," meaning she would recant the sexual assault charges. Williams expressed disbelief in Davis's story. She asked him why he would kill Gray if she was planning to recant the charges. Davis simply responded, "That's what happened." He asked Williams if "[t]his was a capital murder." After Williams confirmed that the charge would be capital murder, Davis stated, "It should be."

Secret Service Special Agent Jeff Shaffer used a digital forensic tool to analyze Davis's T-Mobile cell phone. He discovered that the 903 phone number for the go phone used to call Gray and Morsley on September 6th was listed as a contact called "Throw Away" in Davis's T-Mobile phone and then later deleted. The phone also contained a photo of Gray in a bikini top and shorts which

was downloaded on July 13, 2012, and again on September 5, 2012.

Forensic analysis revealed that Davis had used his phone to log into Facebook under the name "Jazmine Brown." Using the Brown profile, he searched for and located Gray's Facebook page. Davis (posing as Brown) sent Gray a message on Facebook on May 1, 2012, saying "Hey, Shania, I'm new in the city and trying to find a cool female to befriend without the drama. I like to shop my butt off. LOL . . . . Get back at me if we have some things in common."

On July 10, 2012, Davis hired a new defense attorney for the sexual assault case. On July 18, 2012, he used his T-Mobile phone to search the Internet for "Can you record a person without them knowing in Texas" and "[b]est way to get off of a sexual assault charge." Also on July 18th, Davis searched for "with no proof that you did the murder can you still be held in jail[?]" The next day, he searched for "can you voice record of [sic] minor over the phone in [T]exas" and "can tape recorded conversation with a person story changing get you off a charge." He performed similar searches on July 23, 2012. He called and exchanged text messages with Gray hundreds of times between July 17, 2012, and August 1, 2012, using the go phone.

On August 24, 2012, the trial judge formally scheduled Davis's sexual-assault trial for October 29, 2012. On August 27th, Davis installed on his T-Mobile phone an application called "Fake Call & SMS & Call Logs." On the same day, text messages appearing to be from Gray's phone were created on Davis's phone, including the following messages:

> Sorry I li3d on u but my momma mad3 m3 do it. If we go to court ima t3ll th3m u never touched me. My momma go b3 mad @ m3 but fuck that bitch I can't stand her no ways. Please 4give me. . . .

> I beli3v3 if I t3ll the truth sh3 will punish m3 for a long tim3 and I want to b3 able to play basketball.

Andrew Hoog, a mobile forensics security expert, testified that he used specialized technology to

analyze Davis's T-Mobile phone. Hoog determined that the above application was used to create these messages on Davis's phone.

On August 28, 2012, Davis used his T-Mobile phone to search for gun shows. On August 29, 2012, he made five calls using his T-Mobile phone to a contact named "Chris." The next day, he used his T-Mobile phone to search for prices on a Diamondback .380 pistol. Police used the serial number on the Diamondback .380 pistol found in the pond and traced the firearm back to a registered owner named Christopher Allen. Allen testified that he is the brother of Davis's ex-girlfriend, Linda Crawford. He said that Davis called him around August 28 or 29, 2012, and asked about buying a handgun from him. Allen agreed to sell Davis the Diamondback .380 pistol for just under $200. He sold the gun to Davis a few days later. Davis paid him in cash.

On the evening of September 5, 2012, Davis (posing as "D") used the go phone to contact Gray again. Phone records showed that, when he initiated these new communications with Gray, the go phone was "hitting off" a cell tower close to her home. He told Gray, "I miss you" and "When can I see you?" Gray asked for a "pic" of "D," but Davis did not send her a photo. The next morning, Davis and Gray continued exchanging text messages. He asked, "What time do you get home from school?" Around lunchtime, Davis told her, "I'm going to be in your area today. I owe you something too." She asked, "Do you?" He responded, "Yep money money yeah yeah lol." She responded, "Lol yay.!!!" Twice, he asked whether Gray and her mother would be dropping off her stepfather that day. She answered, "Nope." At 1:53 p.m., Davis used his T-Mobile phone to search for "hebron high school" and looked up the address of the school in the map "app" on his T-Mobile phone. He also used the map app to look up Sam Houston Trail Park, where Gray's body was eventually found.

Around mid-afternoon, Gray told Davis: "You don't have to come all inside the school." She sent a message to him at 3:46 p.m. asking, "Where are you?" He responded, "Kids park." At 4:01 p.m. Davis's T-Mobile phone "hit off" the cell tower that was right next to Hebron High School, indicating that he was close to the school. At around 5:06 p.m., his phone and Gray's phone were both "hitting off" the cell tower near his apartment. After 5:17 p.m., Gray's phone stopped receiving and sending any data, indicating that it was no longer in contact with the network. Similarly, after 5:15 p.m., Davis's go phone stopped sending and receiving data. An expert testified that this could happen when a phone was thrown into water.

Davis's T-Mobile phone also contained a recorded conversation between Davis (posing as "D") and Gray. In this phone conversation, "D" asked Gray, "What about the person with your big secret?" She responded, "He's permanently locked up . . . . he is permanently in jail. We didn't talk in the first place." He asked, "How did he get in jail if y'all [sic] didn't talk." She said, "It's complicated" and told him to change the subject, but he continued to ask her questions about it. He asked her how he broke the law and she answered, "he committed a crime against me." He asked, "He raped you?" She said, "New subject. Damn it."

Gray told "D" about her little brother's autism and severe disabilities. She discussed her feelings about her real father, who had died before she was born. Later, she returned to the subject of the sexual assaults and their impact on her: "What happened, it fucked my mind up [sic]. It really did . . . . He got inside my head." "D" tried to get her to discuss the matter further. Gray said that she was about to start therapy for this incident and she really did not want to talk about it. She told him that the man who sexually assaulted her was in his late twenties and,

> [He] got into my head. I mean – at first I was going to cover for him [–] that's how stupid I was. I don't know what the hell I was thinking. I was going to cover up and

take all the blame. And then my mama caught us . . . . I had a babysitting job and he was the father of the kids I was babysitting . . . . He think[s] he [is] going to run away from that. Not like that. I was a child.

Gray explained how Davis would come to the apartment and harass her while she was babysitting and Dibrell was not there. Gray said Dibrell did not provide adequate clothing, shoes, or food for the children, so she started taking the children to the store for food whenever she would babysit. She said the kids acted so happy when she came to babysit, that she "kind of felt trapped, like, like [the] kids wasn't [sic] going to have what they needed unless I came. And if I did come over, I [ran] the risk of running into him again." "D" asked her, "How many times did he sexually assault you?" She said, "Probably three or four different times."

She explained that she knew she would have to testify at the trial if Davis did not plead guilty. She said she did not want to be at the trial and she wished that he would plead guilty and make the case disappear. She felt that her mom was blaming her for what had happened and she, too, began to think that it was her fault. After "D" prodded her for more detail about the assaults, she told him about the first time Davis sexually assaulted her. She said Davis told the children to go into the other room and not come out and then he "got what he wanted." She said she was afraid of Davis so she did not tell anyone about the sexual assaults. She explained that she was intimidated by Davis, who was a large, muscular bodybuilder who took out his samurai swords and played with them in front of her. She also did not tell anyone because she was afraid that people would blame her. She said that she was a good student but, around the time of the sexual assaults, she could not concentrate at school and her grades dropped.

"D" told Gray a story about his cousin whom, he claimed, a woman falsely accused of rape. In his story, the accuser was eventually charged with "false imprisonment" and "they locked her up

that day." He asked Gray if Davis had any information about her that he could use to discredit her in that way. She said Davis did not. She explained to "D" that she had given depositions. He asked her why she did not just tell everyone that she had lied, so that they would drop the charges. He said that, because she was a minor, they would not be able to do anything to her. She said that her parents had wanted her to file the charges, and she could not drop them. He suggested that Davis might have a grudge against her and might come after her after he went to "the pen." Gray simply responded, "no." She added that Davis had lied about some text messages. When the phone conversation ended, Gray had not agreed to recant the charges, nor had she stated that she lied about the sexual assaults.

After the State presented its case in chief, Davis took the stand in his own defense. Defense counsel started off by asking him, "Frank, why is Shania dead?" Davis responded, "Because I killed her." Counsel asked, "Why did you kill her?" Davis answered, "Because she ruined my life." Davis said that Gray had a crush on him because he is a "charmer," but he insisted that he never had sexual relations with Gray. He described having sex one time with Dibrell after he got engaged to Arrington. He said Dibrell had told Gray about this incident. He claimed that Gray's text message that he was trying to "have [his] cake and eat it too" actually referred to him having sex with his wife and Dibrell.

Davis further testified that, after he was charged with sexual assault, he lost his job, he could not provide for his family, and his wife looked at him like he was "less than a man." He blamed this misfortune on "Shania's lies." He was frustrated with his attorney's lack of efforts on his behalf and decided he needed to conduct his own "investigation." Davis admitted creating the fake Facebook page in the name of "Jazmine Brown" to try to access Gray's Facebook page. Gray did not accept

the friend request from Jazmine Brown, so Davis asked his nephew, Dominique Elkins, for his Facebook password. Davis sent a friend request to Gray while logged into Facebook as Elkins. Gray accepted that friend request. Davis then obtained Gray's mobile phone number from her Facebook page. He searched on Facebook for a man with an attractive profile picture with light skin and a muscular build. He found a young man meeting this description, then sent the man a message from his Jazmine Brown alias telling him that a friend (i.e., Gray) might be trying to contact him but he should not have any contact with her because she was too young. That night, Davis started sending text messages to Gray using a go phone that he had purchased for this purpose. He told Gray through text messages that he was the man with light skin and muscular build from Facebook.

Davis said he and Gray exchanged text messages for a while and then she began calling him. He recorded their phone conversations using his T-Mobile phone by setting the go phone on the "speaker[ ]phone" setting. He recorded about seven conversations, though two or three of them did not have much content. He said Gray made statements in their phone conversations that he believed were inconsistent with statements she made in the DCAC interview. For example, he said that, on the phone, Gray only described three sexual incidents with him, yet she told the DCAC interviewer they had sex four times. Also, Gray told him that, when she had sex with him in his apartment, it occurred in his bedroom, but she told the DCAC interviewer that it occurred in his bathroom. (The record shows that Gray explained in both interviews that Davis's bathroom was connected to his bedroom and he came into the bathroom to get her). He also pointed to her statement in the recordings that she had had sex for the first time before her first encounter with him.

Davis said he took his recordings of the phone conversations to his lawyer, whose "judgment was kind of iffy" about them. Davis said he decided he wanted to play the recorded phone calls for

Gray's parents. He drove to Gray's house the next day and sat for a while in his car watching Gray playing basketball with her little brother at the nearby park. He debated whether to go inside and talk to Gray's parents. He called Linda Crawford, the mother of one of his children, and she told him about an application that would generate fake text messages. Instead of talking to Gray's parents, he decided to use the application to make some fake text messages from Gray. He decided this would give him a little "extra push" to get the prosecutor to dismiss the case against him. He admitted creating the false text messages from Gray presented by the State. He said he also mentioned to Crawford that he wanted to get a gun so he could go to the shooting range. She put him in touch with her brother, Chris Allen. Davis bought the Diamondback .380 from Allen about a week before he shot Gray with it.

Davis also admitted performing the Internet search asking whether a person would stay in jail on a murder charge if investigators could not find the body. Davis stated that he did the last search because of "the thoughts going through [his] head of wanting to do harm to Shania . . . she ruined my life. I wanted to ruin hers."

Davis said he shared his thoughts with his wife, Arrington, and she told him it was too much for her to "deal with." He said that was when it really started "eating at" him. He was "thinking about hurting [himself], hurting other people," specifically Gray. He said he drove out to Gray's home on or around September 5th with his new gun, intending to "kill everybody in the house." He sat outside for a while and "couldn't get the thought out of [his] head." He got out of his car and went into their front yard, but he did not go inside. He thought about Gray's innocent little brother with his health issues. Davis decided against killing them and drove home.

Davis said he renewed contact with Gray around that time using the go phone and posing as

"D." Davis explained the gap in their communications by telling Gray that he had been in school and had turned off his phone to focus on his studies. He said he was "speaking of money so she would want to meet up" with him. He arranged to meet her after school at Hebron High School. They agreed to meet at the parking lot by the tennis courts. Davis said that, when Gray came out of the school and saw him instead of "D," she "froze up" and said, "Oh, shit." He approached her and assured her he was not going to hurt her. She walked with him to his car and got into the passenger seat. He started the car and pulled away. She objected, saying that her mother was waiting for her on the other side of the school. Davis said he continued driving because he wanted to kill her. He placed the gun between his legs while he was driving.

Davis further testified that he took Gray to Sam Houston Trail Park. He ordered Gray to delete the text message exchanges with "D" and then turn her phone off, and she complied. They sat in the car for a while and he berated her for having a happy life. Davis said he was thinking of how he was raped by both his grandfather and his brother and how his youngest daughter had holes in her shoes because he could not provide for her. He told Gray to leave her phone in the car and made her walk down the slope toward the river, and then he shot her. He was aiming for her head. She fell into the water, and then he shot her again. He walked down the slope to make sure she was dead. She asked, "Why, Wish[?]" and told him that the right side of her body was going numb. He threw her the end of her jacket and pulled her out of the water, injuring his tricep muscle in the process. He told her to lie down, then he stepped on her neck and held his foot there. She briefly reached up and touched his ankle and then her hand fell. He rolled her into the water and then he left.

Davis described the four police interviews he gave. He admitted that he lied in the first two

interviews and that he continued to lie about the fake text messages throughout all the interviews. The defense presented two recordings of statements Davis made to the media. In these media recordings, Davis tearfully admitted that he murdered Gray. He blamed the murders on a part of him called "Wish," which he described as a kind of evil alter ego. Davis repeatedly denied sexually assaulting Gray and said he became increasingly obsessed with hurting people as his trial was repeatedly delayed. He told one reporter that he had text messages in his phone showing that Gray admitted she lied about the sexual assaults. The text messages he described to the reporter matched the fake text messages he created to bolster his defense. Davis also told the reporter that he did not intend to kill Gray when he went to meet her at her school. He said he just wanted to talk with her. He said he had the gun with him only because he had owned it for a long time and carried it with him all the time.

The State called Dibrell in rebuttal. Dibrell contradicted Davis's testimony about whether she told Gray about her sexual encounter with Davis. She said she never told Gray about it because "[Gray] was a child, and I don't discuss stuff like that with children." Dibrell recalled that she had argued with Davis about the excessive amount of time he was spending at her apartment when she was not home. She was angry with Davis because, although he had refused to babysit the children for her, he kept coming over when Gray was there watching the children. She testified that Davis had asked her to provide a statement for his sexual assault trial asserting that her children said that he was never alone with Gray. She refused to write that statement. Dibrell testified that Davis was not always truthful.

At the punishment stage of trial, Linda Crawford testified that, when she was sixteen years old and seven or eight months pregnant with Davis's son, she walked in on Davis and another

woman at his apartment. Davis pushed her out, grabbed her by the throat, picked her up, and held her against the building. He ordered her to leave and not come back. Later, when she was holding their young son, Davis hit her with a coat hanger and cut her arm.

Similarly, Dibrell testified that Davis had been violent with her on multiple occasions during their relationship. She said that these incidents had twice resulted in her nose bleeding. Once, Davis "pulled a knife" on her. On another occasion, he shot her in the leg with a BB gun. When she was pregnant with their daughter, she caught him with another woman and they argued. He grabbed her, pinned her arms, and whispered into her ear that he hoped she would lose the baby.

Labrena Henderson, the mother of one of Davis's sons, testified that she lived with Davis from 1999 through 2001. She recalled that Davis once pushed her violently against a wall during an argument. She also testified that she and Davis would fight when Davis would take her car at night and use it to look for girls and break into other people's cars.

The State introduced records revealing that Davis received a deferred adjudication in 1999 for theft of property valued between $1,500 and $20,000, and that his probation had been revoked in January 2001 due in part to a subsequent burglary of a motor vehicle. Davis's criminal record also included convictions for evading arrest and failure to identify in February 2001, and fleeing or attempting to elude a police officer in October 2007.

Deputy Steven Underwood testified that he was assigned to supervise Davis when Davis was hospitalized during his incarceration while awaiting in this case. Davis, who was secured to the bed with leg restraints and handcuffs, asked Underwood if he could take a shower before he was sent back to the jail. Underwood agreed. As soon as Underwood unlocked the restraints, Davis said, "I'm sorry, man," grabbed Underwood, and backed him into the wall. As the two men struggled, Davis grasped for Underwood's gun. Underwood saw that Davis had some sort of sharp object in

his hand, but could not tell what it was. (Officers later located in the hospital room a Shasta can that had been torn and pinched to form a sharp edge.) Underwood heard a "pop" and saw that his holster had come off and Davis was holding his gun. Davis pulled away from Underwood and pointed the gun at him. He pulled the slide back to make sure the gun was loaded and ordered Underwood to "[g]et on the ground." Underwood complied.

Davis then ran out of the hospital. He fled to a nearby residential area, where he tried to convince a family to let him inside their home by claiming that someone was shooting at him. The mother refused to let him in, but she offered to call 911 for him. Davis asked her not to call the police, saying that he had "warrants," and fled again. The family later found Underwood's gun stuffed inside a hospital sock in their front yard. They called the police, who came to the house and discovered that there was a round in the pistol's chamber. Davis was located while hiding in a red van in a parking lot near the hospital. Over eighty officers surrounded the parking lot and Davis eventually surrendered.

Arrington took the stand and testified about her relationship with Davis. She explained that, on at least twenty occasions, he had become extremely angry with her and choked her. This would usually happen whenever they argued, even over something minor. She said Davis would typically "tussle" or wrestle with her first, and then push her up against the wall while choking her with both hands. On approximately three of these occasions, he threatened Arrington with knives and he once placed a gun against her head. He also once threw her against a brick fireplace, and she suffered bruising. After these fights, Davis would apologize. He would talk to Arrington about the fact that his mother was murdered and remind her that his family had placed him in foster care. Arrington tearfully conceded that she did not reveal Davis's assaultive conduct when initially questioned by Detective Williams, she never called the police following these assaults, and she did not tell her

family. She said that she did not report the assaults because she loved Davis and did not want to become one of the people who had "abandoned him, as he calls it." Arrington said she felt ashamed of her failure to report his abuse and intended to divorce him after the trial.

The defense offered testimony showing that, as a child, Davis lived with his six siblings, mother, and grandfather in a small apartment in a poverty-stricken, crime-ridden neighborhood in St. Louis, Missouri. Davis's sister testified that their grandfather molested all of the children in the house. Medical records suggested that Davis's intellectually-disabled older brother had sex with his younger siblings. After Davis's mother shot another resident of the housing complex, Davis and his six siblings were placed in foster care. When she was released from prison, Davis's mother moved to Texarkana, where the children were then living, and resumed her role as parent. However, she was re-arrested for violating her parole and sent back to prison. She was brutally raped and then murdered with a shotgun when Davis was a teenager. Davis's foster mother, who raised him for one year when he was fifteen or sixteen years old, testified that he was always obedient and he liked to tell jokes. However, after Davis left her home and went to live with his sister, his foster mother started hearing about him getting into trouble. Other caretakers who worked with Davis as a teenager stated that he was respectful and polite. Latrice Brown, the mother of Davis's oldest daughter, Kurstyne, testified that Davis was a good father and took care of their daughter for over three years while Brown was incarcerated. Kurstyne testified that she loves her father and has a good relationship with him.

The defense further offered expert witness testimony that Davis would be a vulnerable inmate lacking "juice" or power in the prison system due to the nature of the offense he committed. Frank Au Buchon, a retired Texas prison classification official, testified that an offender sentenced to life without parole could never receive a classification any less restrictive than level three in the general

population. Because Davis had attempted to escape, the least restrictive classification that Davis would receive upon entering prison would be level four. And, because he had committed a violent act against a staff member within the past year, he could be classified as level five, which is the most restrictive general population classification. Moreover, considering the fact that Davis had physically assaulted and disarmed an officer using a makeshift weapon during a premeditated escape attempt, Au Buchon opined that Davis "needs to go to administrative segregation for a long time." Au Buchon acknowledged that he could only make an "educated guess" about how the prison system would actually classify Davis. Au Buchon agreed that, if an inmate took a gun from a guard on one occasion, he might be willing to do it again. Au Buchon also stated that Davis would have contact with female guards in prison.

A Texarkana police officer testified that Davis reported to authorities that his uncle, Robert Elkins, had admitted committing a robbery. Davis provided information that aided officers in preventing Elkins from committing another robbery. On cross-examination, however, the State elicited testimony that, two days before Davis provided information to police about Elkins, Davis was arrested with Elkins for possession of criminal instruments. Further, Davis was a suspect in a burglary committed during the same time period. After assisting the police, Davis was not prosecuted for burglary or for possession of criminal instruments.

Gray-James took the stand again and described the effects of her daughter's murder on her family. She also described the terror she experienced when she learned that Davis had escaped from custody.

SUFFICIENCY OF THE EVIDENCE

In point of error eleven, Davis contends that the evidence is legally insufficient to support his conviction for capital murder. When reviewing the sufficiency of the evidence, we consider all

of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.[6] This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."[7] Each fact need not point directly and independently to the defendant's guilt, as long as the cumulative effect of all the incriminating facts is sufficient to support the conviction.[8] Motive is a significant circumstance indicating guilt, and intent may be inferred from a defendant's acts, words, and conduct.[9] In addition, attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations are probative of unlawful acts and circumstances indicative of guilt.[10]

Davis argues that the evidence was insufficient to prove the underlying offense of obstruction. He admits that he intentionally shot and killed Gray, but he disputes the State's evidence concerning his motive for killing her. Texas Penal Code § 36.06 provides:

> (a) A person commits an offense if he intentionally or knowingly harms or threatens to harm another by an unlawful act:
> . . .
>
> (2) to prevent or delay the service of another as a:
>
> (A) public servant, witness, prospective witness, or informant; or
>
> (B) person who has reported or who the actor knows intends to report the occurrence

---

[6] *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979).

[7] *Id*. at 319.

[8] *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004).

[9] *Id*. at 50.

[10] *Id.*

of a crime.[11]

Chapter 36 does not define the term "prospective witness." However, this Court has determined that official court proceedings need not have been initiated in order for a person who has information about a crime to be a "prospective witness" covered by this statute.[12] A "central purpose" of § 36.06 is to encourage public servants, witnesses, prospective witnesses, and informants to perform vital public duties, such as reporting criminal activities, testifying in official proceedings, and cooperating with the government in criminal investigations, without fear of harm or physical injury.[13]

The record in this case shows—and Davis does not dispute—that Gray was "a person who ha[d] reported . . . [t]he occurrence of a crime" and was a "prospective witness" in Davis's upcoming sexual assault trial. Further, the record indisputably shows that Davis intentionally and knowingly harmed Gray by an unlawful act. In fact, Davis admitted to police, television reporters, and the jury that he intentionally shot Gray twice with a firearm and then stepped on her neck until she stopped struggling. And there is no dispute that Davis knew that Gray had accused him of sexually assaulting her and knew that she intended to serve as a witness against him.

Thus, the only remaining element of obstruction at issue is whether Davis killed Gray for the purpose of preventing or delaying her service as a witness, prospective witness, or person who reported the occurrence of a crime. Davis argues that the State did not prove that he killed Gray in order to prevent her from testifying, noting that he "never stated that was the reason he murdered her, even though all the detectives tried to get him to admit this." Davis emphasizes that he repeatedly

---

[11] TEX. PENAL CODE § 36.06(a)(2).

[12] *Morrow v. State*, 862 S.W.2d 612, 614 (Tex. Crim. App. 1993).

[13] *Cada v. State*, 334 S.W.3d 766, 771 (Tex. Crim. App. 2011).

told the detectives that he murdered Gray out of anger and a desire for revenge because he believed that she had ruined his life.

The record, however, contains ample evidence from which a reasonable juror could conclude that Davis killed Gray for the purpose of preventing her from testifying against him. Gray was the named victim and the only eyewitness in the four sexual assault cases. Davis did not react violently when Gray first brought the charges, when he was arrested, or even when he lost his job. Rather, as Davis's court date on the sexual assault charges approached, he became singularly focused on combating the charges and targeting Gray. He concocted and executed an elaborate ruse whereby he pretended to be a young man named "D" in order to gain Gray's confidence, and he had hundreds of communications with Gray. Davis claimed that he was confident that the recordings of his phone conversations with Gray would bolster his defense, because they demonstrated that Gray had lied about the sexual assaults. However, the one recorded conversation in which he and Gray discussed the sexual assaults does not support his contention. In this conversation, Gray reluctantly described the sexual assaults to "D," explaining how Davis had intimidated and manipulated her. In response, Davis attempted to cajole and frighten her into telling people that she had lied about the assaults, and yet she refused. A reasonable juror could have deduced from this evidence that Davis did sexually assault Gray and, knowing that she was an indispensable witness against him, actively attempted to convince her not to participate in the trial and, failing that, murdered her.

Other evidence in the record suggests that Davis was very concerned about his upcoming sexual assault trial, and he developed a plan to manufacture evidence and dispose of Gray as his trial date approached. Over two weeks before he killed Gray, he used his T-Mobile phone to search for "[b]est way to get off of a sexual assault charge" and "with no proof that you did the murder can you

still be held in jail[?]" Three days after the hearing at which the trial judge set his trial date, Davis downloaded a fake text message application and used it to create text messages, purportedly from Gray, saying she was sorry that she had lied about the sexual assaults. He additionally asked Dibrell to manufacture statements (purportedly made by her children) to support his defense. The day after he created the bogus text messages, he began actively seeking to purchase a gun. Shortly thereafter, he obtained the Diamondback .380 pistol. Less than a week after he bought the gun, he assumed his "D" persona again and contacted Gray. He began trying to convince her to meet with "D" after school, making sure that her stepfather would not be present. He used his phone to search for the location of her school and an isolated park where he would be able to kill her without being seen. He enticed her to meet him behind the school by leading her to think that "D" planned to give her something that might be "money money." Davis brought a loaded gun with him to meet Gray at the school. After killing her, he shoved her body in the river, then carefully disposed of the murder weapon, their phones, and other incriminating evidence. Later that evening, he doused the car with cologne before picking up his wife from work.

The jury was charged with weighing any conflicts in the evidence and evaluating the credibility of the witnesses. The jurors had the opportunity to evaluate Davis's credibility as he testified at trial concerning his motive for the killing. They were free to believe or disbelieve some or all of his testimony. They were also free to draw reasonable, yet adverse inferences from his acts, words, and conduct, including his attempts to manufacture evidence and his inconsistent statements and explanations. The jury could have reasonably inferred from the evidence that Davis intentionally killed Gray to prevent her service as witness against him.

We hold that the evidence, viewed in the light most favorable to the verdict, is legally

sufficient to support the jury's verdict that Davis intentionally murdered Gray in the course of committing or attempting to commit the offense of obstruction. Davis's eleventh point of error is overruled.

In point of error twenty-four, Davis challenges the legal sufficiency of the evidence to support the jury's affirmative answer to the future dangerousness special issue.[14] He argues that the evidence was insufficient because he had no prior violent offense convictions and "the defense witnesses testified that he essentially was a low risk for future dangerousness."

When reviewing the legal sufficiency of the evidence to support the jury's answer to the future dangerousness special issue, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have believed beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.[15] In its determination of this special issue, the jury is entitled to consider all of the evidence admitted at both the guilt and punishment phases of trial.[16] This Court has not required that the record contain evidence of prior violent offense convictions to support a jury's finding of future dangerousness.[17] The circumstances of the offense and the events

---

[14] *See* TEX. CODE CRIM. PROC. art. 37.071, § 2(b)(1).

[15] *Williams v. State,* 273 S.W.3d 200, 213 (Tex. Crim. App. 2008); *Jackson,* 443 U.S. at 319.

[16] *Young v. State,* 283 S.W.3d 854, 863 (Tex. Crim. App. 2009).

[17] *See Howard v. State*, 153 S.W.3d 382, 384 (Tex. Crim. App. 2004) (stating that, in light of the facts of the offense and the defendant's disregard for authority, his prior assaultive conduct, and his other illegal acts, the evidence was sufficient to support the jury's answer to the future dangerousness special issue, despite the defendant's lack of prior convictions for criminal violence).

surrounding it may alone be sufficient to sustain an affirmative answer to this special issue.[18]

The evidence admitted at the punishment phase of trial showed that Davis had committed several adjudicated and unadjudicated criminal acts throughout his life including theft, evading apprehension of law enforcement officers, and burglary of a vehicle. Armed with a home-made weapon, he had executed a violent escape from custody in which he overpowered an officer and took his firearm. Further, he had demonstrated a pattern of assaulting his intimate partners. Davis, who is a bodybuilder, had thrown women up against walls, choked them, injured them, and threatened them with knives and firearms. Some of these assaults were committed when young children were present. Although Davis asserts that defense punishment witnesses "essentially" testified that he presented a low risk for violent conduct, Frank Au Buchon testified that Davis might very well attempt to take an officer's firearm again and "need[ed] to go to administrative segregation for a long time."[19] The jury also heard evidence of Davis's sexual assaults of Gray and other threatening conduct towards her when she was only fourteen years old, as well as the circumstances surrounding the instant brutal, premeditated murder. Moreover, a rational jury could have given particular weight to Davis's admissions that, as his trial was repeatedly delayed, he had experienced persistent thoughts of killing Gray's entire family and had become increasingly preoccupied with hurting people.

Viewing the record in the light most favorable to the jury's punishment verdict, the evidence was sufficient to support the jury's affirmative answer to the future dangerousness special issue. We

---

[18] *Devoe v. State,* 354 S.W.3d 457, 462 (Tex. Crim. App. 2011).

[19] *See Thomas v. State*, 444 S.W.3d 4, 8 (Tex. Crim. App. 2014) ("[W]hen the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict, and we defer to that determination.").

overrule Davis's twenty-fourth point of error.

## *BATSON* CHALLENGES

In Davis's first, second, and third points of error, he contends that the trial judge erred in overruling his objections that the State's use of peremptory challenges against three African-American prospective jurors violated *Batson v. Kentucky*.[20] In *Batson*, the Supreme Court held that the State violates the Equal Protection Clause when it excludes a veniremember based on his or her race. A *Batson* challenge to the State's use of a peremptory strike has three steps. First, the opponent of the strike must establish a prima facie case of racial discrimination.[21] Second, if the opponent makes the requisite showing, the burden shifts to the proponent of the strike to articulate a reason for the strike that is race-neutral on its face.[22] Third, if a race-neutral explanation is offered, then the trial judge must determine whether the opponent of the strike has shown purposeful discrimination.[23] "Whether the opponent satisfies his burden of persuasion to show that the proponent's facially race-neutral explanation for his strike is pre-textual, not genuine, is a question of fact for the trial court."[24]

Although the burden of production shifts after the opponent makes a prima facie case, the burden of persuasion remains with the opponent of the strike to establish purposeful discrimination.[25]

---

[20] 476 U.S. 79 (1986).

[21] *Nieto v. State*, 365 S.W.3d 673, 675-76 (Tex. Crim. App. 2012).

[22] *Watkins v. State*, 245 S.W.3d 444, 447 (Tex. Crim. App. 2008).

[23] *Nieto*, 365 S.W.3d at 675-76.

[24] *Watkins*, 245 S.W.3d at 447.

[25] *See Ford v. State*, 1 S.W.3d 691, 693 (Tex. Crim. App. 1999); *see also* TEX. CODE CRIM. PROC. art. 35.261(a).

We review the evidence in the light most favorable to the trial judge's ruling and will uphold the ruling unless it is clearly erroneous. In determining whether clear error occurred, we look to the entire record of the voir dire, not merely the passages highlighted by the parties.[26]

Davis compares three peremptorily-struck African-American veniremembers with non-minority veniremembers who were not struck by the State. He argues that they gave "similar" answers on the jury questionnaire. He contends that this comparative juror analysis provides evidence of intentional discrimination based on race.[27] However, a comparative juror analysis is only one of several nonexclusive factors the Supreme Court has identified in determining whether intentional discrimination occurred.[28]

*Prima Facia Case*

Davis argues that the State used three of its peremptory strikes to eliminate three of six (50%) of the qualified African-American veniremembers within the strike range reached during voir dire: Syrene Mitchell (No. 15), Louise Horsely (No. 27), and Freddie Watson (No. 34). At the pretrial hearing on Davis's *Batson* challenges, the State disputed Davis's prima facie case. However, before seeking a ruling on the prima facie case issue, the prosecutor moved directly to discussing his race-neutral reasons for striking each of the complained-of jurors. Because the prosecutor did not seek a timely ruling on Davis's prima facie case or object to the trial judge's failure to rule, the prima

---

[26] *Nieto*, 365 S.W.3d at 675-76.

[27] *See Reed v. Quarterman*, 555 F.3d 364, 370-76 (5th Cir. 2009) (citing *Miller-El v. Dretke*, 545 U.S. 231 (2005)).

[28] *Watkins*, 245 S.W.3d at 448-49 (citing *Miller-El*, 545 U.S. at 263-64).

facie case issue is now moot and cannot be raised by the State on appeal.[29]

*Veniremembers Mitchell and Horsely*

Based on Mitchell's questionnaire answers, Davis asserts that Mitchell is the type of juror that the State should have wanted on the jury. Davis notes that Mitchell answered "no" to the question, "Do you have any moral, religious or personal beliefs that would prevent you from returning a verdict which would result in the execution of another human being?" while one of the seated jurors answered this question, "yes." He points out that Mitchell agreed that intentional murder during the course of obstruction should be a capital offense, "as [had] all jurors accepted by the State," and that Mitchell had not heard about the case, "as did sixteen jurors accepted by the State." He further observes that Mitchell ranked himself a six out of ten when asked how strongly he believed in the death penalty, while five jurors accepted by the State ranked themselves a six or lower on this question.

Davis contends that Horsely also had characteristics that would have benefitted the State, including her intelligence, her military service, and her statement that she could make the decision to assess the death penalty "under the right circumstances." He states that her answers to certain questions were similar to those given by others who were accepted as jurors. Davis argues the trial judge failed to examine the validity of the State's proffered reasons and the credibility of the prosecutor. He contends the State's reasons for the peremptory strikes were mere pretexts for purposeful discrimination.

In his brief, Davis fails to focus on the specific race-neutral reasons enumerated by the State.

---

[29] *See Chambers v. State*, 866 S.W.2d 9, 23 (Tex. Crim. App. 1993) (determining that, when the prosecutor did not object to the trial judge's failure to rule on the defendant's prima facie case, that issue became moot and could not be raised on appeal).

At the *Batson* hearing, the prosecutor explained that both Mitchell and Horsely had entered a value of three in response to Question Two on the juror questionnaire, which read, "With reference to the death penalty, which of the following statements *best* represents your feelings? (*Circle only one.*)" Answer number three corresponded to the following statement: "Although I do not believe that the death penalty should ever be imposed, as long as the law provides for it, I could assess it under the proper set of circumstances." The prosecutor stated that the State struck all veniremembers who answered this question with a value of three or higher. Higher numbered answers became progressively less favorable to the death penalty. The prosecutor also stated that Mitchell indicated that he would hold the State to a higher burden of proof in a death penalty case. The trial judge asked defense counsel if he had any response to the State's explanations. Defense counsel did not offer any further argument or dispute the State's assertions about these jurors.[30] The judge then denied Davis's *Batson* challenges to Mitchell and Horsely.

The State's first asserted justification for its peremptory strikes—that Mitchell and Horsely gave an answer on the questionnaire expressing that they did not believe in the death penalty—is the type of reason we have held in the past to be facially race-neutral.[31] Further, the record shows that

---

[30] *See Camacho v. State*, 864 S.W.2d 524, 529 (Tex. Crim. App. 1993) ("The appellant, having heard the apparently race-neutral explanation of the prosecutor[,] had nothing additional to present in impeachment of or rebuttal to that explanation.").

[31] *See, e.g.*, *Camacho,* 864 S.W.2d at 529 (acknowledging that prosecutor's concern over prospective juror's questionnaire answers was a race-neutral justification for peremptory strike where prospective juror circled, "Although I do not personally believe in the death penalty, as long as the law provides for it, I could assess it under the proper set of facts and circumstances"); *Williams v. State*, 937 S.W.2d 479, 485 (Tex. Crim. App. 1996) (finding prospective juror's answer on questionnaire that "agreed with the proposition that she does not believe in capital punishment, but it is not practically advisable to abolish it" to be a race-neutral reason for peremptory strike).

(continued...)

none of the veniremembers accepted by the State answered Question Two with a three or higher. In fact, all of the individuals seated as jurors or alternates answered this question with a two, which corresponded to the following statement: "I believe that the death penalty is appropriate in some murder cases, and I could return a verdict in a proper case which assessed the death penalty." Moreover, the record supports the prosecutor's claim that the State peremptorily struck non-minority veniremembers who, like Mitchell and Horsely, answered this question with a value of three or higher.

In addition, the record shows that Mitchell indicated several times that he would hold the State to a higher burden at the guilt-innocence phase in a death penalty case than in an ordinary criminal case. For example, Mitchell was asked, "When the State of Texas is saying that person over there needs to be killed based on his actions and based on what future actions he might do, then that standard has to be higher than what we're talking about in a normal burglary of a habitation case . . . . Would you agree with that?" Mitchell responded, "Yes, I do." Mitchell later responded, "I don't know that I'd make it any higher than a reasonable doubt," but he then agreed that he is the type of person who believes that, "if you're going to charge someone with a death penalty [offense] and seek the death penalty, the standard of proof is higher than . . . beyond a reasonable doubt." He stated that he believed the burden for death penalty cases "should be higher," and he "would hold the State to a higher burden."

Mitchell equivocated upon cross-examination by defense counsel and questioning by the trial judge. At one point, he stated that he would apply the beyond-a-reasonable-doubt standard in a death-penalty case. However, he also asserted that his beyond-a-reasonable-doubt standard would

---

[31](...continued)

be higher in a capital murder case than it would in a burglary case. Although the trial judge denied the State's challenge for cause on this basis, Mitchell's vacillation on this issue was nevertheless a valid, race-neutral reason supporting the State's peremptory strike.[32]

Davis has not shown that Mitchell and Horsely were treated differently from non-minority veniremembers or that the prosecutor's stated reasons for striking them were a pretext for discrimination.

### *Veniremember Watson*

Davis emphasizes that, during voir dire, Watson stated that killing a witness to keep her from testifying should be capital murder and, when told what the two possible punishments for that crime were, Watson stated, "[R]ight." Similarly, Davis notes that Watson responded, "[R]ight," as the prosecutor explained how a person could post bond and the reasons for the bond requirement. Davis maintains that Watson's answers on other questions showed that he was a proponent of the death penalty. He asserts that Watson's answers were similar to the answers of non-minority veniremembers who were seated on the jury. He submits that the State's justifications for the peremptory strike of Watson were implausible and merely a pretext for purposeful discrimination.

The prosecutor stated at the *Batson* hearing that he struck Watson for a combination of reasons. First, on his questionnaire, Watson added a handwritten note after his answer to question number twelve. Question number twelve read:

> The crime of "Obstruction" means harming or threatening to harm another person to prevent or delay the service of that person as a witness or prospective witness. The law in the State of Texas says that the ***intentional murder of an individual during the course of committing or attempting to commit the offense of "obstruction"*** is

---

[32] *See Chambers*, 866 S.W.2d at 24 (observing that a prospective juror's vacillation on an issue related to the death penalty was a race-neutral explanation for the State's peremptory strike of the juror).

> a capital offense, for which, depending on the facts and circumstances of the case, a sentence of life without parole or the death penalty may be imposed? [sic] Do you agree with the punishment range outlined above?

Watson checked "yes" in response to this question but then wrote, "Life without parole would be better for me."

Second, at the end of his individual voir dire, Watson notified the trial judge that he had read about the case in the newspaper. At this point, both sides had already interviewed Watson, and he had stated on his questionnaire that he had not heard anything about the case in the media.

Third, on a question about the presumption of innocence, Watson added the notation: "Should be set free until trial is over." He also asked during voir dire why a defendant could not be allowed to remain free in the community until the conclusion of his trial, suggesting that the presumption of innocence should mandate his release. The prosecutor then explained the bond process and the purpose for requiring a bond. At the *Batson* hearing, the prosecutor said Watson seemed unsatisfied with this explanation.

The record shows that, after offering an extensive explanation of the bond process in response to Watson's concerns, the prosecutor asked Watson, "Is that okay?" Watson responded, "Yeah, mostly. It answers the question, but it . . . still seems like to me that if a bond is set for a person, there are still implications that that person is guilty." Watson continued to indicate that he believed forcing a defendant to pay a bond meant that the person was being presumed guilty, rather than innocent. Thus, the record supports the prosecutor's claim that Watson was not satisfied with his explanation. Watson's statements arguably indicated a bias against the State and for Davis.

Additionally, the State asserted at the *Batson* hearing that Watson was the only one of the forty-five jurors questioned who wrote, "life without parole would be better for me," and expressed concern about why the defendant would not be released while awaiting the outcome of his trial. The

trial judge asked defense counsel for a response to the State's race-neutral explanation. Counsel did not respond to or contradict the prosecutor's assertions. The burden of persuasion remained with Davis's counsel to establish that a prohibited motive lay behind the State's peremptory strike.[33] The record supports the prosecutor's assertions about the race-neutral reasons for the strike, and defense counsel did not rebut them. Davis has not demonstrated that the State's race-neutral reasons were merely a pretext for discrimination.

The trial judge's rulings denying Davis's *Batson* challenges are supported by the record and were not clearly erroneous. We overrule Davis's first, second, and third points of error.

## DISCHARGE OF DISABLED JUROR

In his fourth point of error, Davis argues that the trial judge abused his discretion in discharging juror John Bigley due to a disability. Davis contends that the record contains "no evidence" supporting the trial judge's finding that Bigley suffered an emotional disability justifying his discharge under Texas Code of Criminal Procedure Article 36.29(b), which provides in relevant part:

> If alternate jurors have been selected in a capital case in which the state seeks the death penalty and a juror dies or becomes disabled from sitting at any time before the charge of the court is read to the jury, the alternate juror whose name was called first under Article 35.26 of this code shall replace the dead or disabled juror.

On August 29, 2013, with counsel for both parties and Davis present, the trial judge convened a hearing regarding Bigley "under the auspices" of Article 36.29(b). The judge explained that the trial was originally set for August 19th, but at the request of the defense, he had continued the trial to November 4th to allow the defense to develop "certain potentially mitigating evidence." Bigley had expressed "extreme reluctance" about the new trial date to court staff. The judge stated

---

[33] *See Camacho*, 864 S.W.2d at 529.

that he called Bigley to discuss the matter. The judge said that Bigley "was adamant that because of his work situation that he simply did not feel like he would be able to be fair and impartial to both sides and to carefully weigh the evidence because his mind would be elsewhere." The judge then contacted Bigley's boss in the Netherlands via email. The boss said that Bigley's participation at work from November 4th through November 18th was critical. Defense counsel objected to the trial judge excusing Bigley from jury service.

The trial judge then called Bigley to the stand. Bigley explained that he is the only United States employee for a company called In Continuum. He said that, due to the nature of his business, all of his work setting up partnerships and relationships would be coming to fruition in the last quarter of the year. Bigley testified that, if he was forced to serve as a juror in November, he would have to work early mornings, trial breaks, lunch periods, and late nights during the trial to close deals and he would be distracted during the trial. He said he would do his best to fulfill his duties as a juror, but he would be thinking about the work he needed to do and he would be worried about keeping his job. The judge asked him, "Is it fair to say that because of your emotional state, you're concerned that you would not be attentive during the trial?" Bigley answered, "That's correct." The trial judge discharged Bigley from jury service and replaced him with one of the two alternate jurors. The jury was subsequently sworn on November 4, 2013.

Although Article 36.29 was discussed at the pretrial hearing and in Davis's brief, it was not applicable in this case because the jury had not yet been sworn when Bigley was removed. This Court has held that Article 36.29 applies only after the jury has been sworn.[34] In this case, the trial judge did not swear in the twelve jurors until after Bigley had been discharged and replaced with an

---

[34] *Broussard v. State*, 910 S.W.2d 952, 957 (Tex. Crim. App. 1995) (citing *Williams v. State*, 631 S.W.2d 955, 957 (Tex. Crim. App. 1982)).

alternate juror. Although there is no statutorily defined procedure for discharging jurors that applies to this particular situation, we have held that a trial judge does not err in following the process set out in Article 36.29 and replacing a disabled juror with a duly-selected alternate juror.[35]

Article 36.29(b) sets out the process for replacing a juror who "becomes disabled from sitting," but it does not define the phrase "disabled from sitting." Under Article 36.29, a trial judge has discretion to determine whether a juror has become disabled and to replace that juror with an alternate juror.[36] We have interpreted the phrase "disabled from sitting" in Article 36.29 to require that the juror must be suffering from a "physical illness, mental condition, or emotional state that would hinder or inhibit the juror from performing his or her duties as a juror."[37] A disability in this context is "not limited to physical disease, but also includes 'any condition that inhibits a juror from fully and fairly performing the functions of a juror.'"[38]

The trial judge's decision is subject to a review for abuse of discretion and, absent such an abuse, no reversible error will be found.[39] When reviewing the dismissal of a juror, we will not

---

[35] *Id.* at 958 ("Faced with the need to complete the jury, and having no specific statutory directive, the trial court chose an acceptable option by replacing the disabled venireman with a venireman who had already been qualified and accepted by both parties . . . . Had the court simply waited until swearing the jury to dismiss the disabled venireman, the court would have been absolutely required to replace him with the alternate.").

[36] *Scales v. State*, 380 S.W.3d 780, 783 (Tex. Crim. App. 2012).

[37] *Id*.

[38] *Reyes v. State*, 30 S.W.3d 409, 411 (Tex. Crim. App. 2000); *see also Routier v. State*, 112 S.W.3d 554, 588 (Tex. Crim. App. 2003).

[39] *Routier*, 112 S.W.3d at 588.

substitute our judgment for that of the trial judge.[40]  Rather, we assess whether, after viewing the evidence in the light most favorable to the trial judge's ruling, the ruling was arbitrary or unreasonable.[41]  We will uphold a trial judge's ruling discharging a disabled juror if it is within the zone of reasonable disagreement.[42]

The evidence, viewed in the light most favorable to the trial judge's ruling, shows that, if Bigley had been forced to serve as a juror in this capital murder trial, he would have been very preoccupied with his work, unable to pay attention to the trial, and worried about keeping his job. His emotional state would have inhibited him from fully and fairly performing the functions of a juror.[43]  We hold the judge did not abuse his discretion in discharging Bigley under these circumstances.  Davis's fourth point of error is overruled.

MOTION TO QUASH THE INDICTMENT

In Davis's fifth point of error, he maintains that the trial judge erred in denying his motion to quash the indictment.  Davis argues that the indictment

> fails to allege an offense against [him] with that degree of certainty that will give him notice of the particular offense with which he is charged in violation of Art. 21.11 C.C.P. and fails to inform [him] of the nature and cause of the accusation against him in violation of Art. I, Sec. 10 of the Constitution of the State of Texas, and the Sixth

---

[40] *Scales*, 380 S.W.3d at 784.

[41] *Id.*

[42] *Id.*

[43] *See Ramos v. State*, 934 S.W.2d 358, 369 (Tex. Crim. App. 1996) (finding that, where a juror would be unable to concentrate due to the time pressures associated with moving and starting a new job, the emotional pressures he suffered justified the trial judge's decision to discharge him under Article 36.29); *see also Freeman v. State*, 838 S.W.2d 772, 774 (Tex. App.—Corpus Christi 1992, pet. ref'd) (finding no abuse of discretion in dismissing a juror under Article 36.29, where the juror "was very concerned about being absent from his job and he did not feel that he could be attentive during trial").

> Amendment and Due Process Clause of the Fourteenth Amendment of the Constitution of the United States[,] in that said indictment fails to specify the manner and means by which he allegedly committed the offense of obstruction with sufficient specificity to allow [him] to defend himself.

Davis contends that the indictment should have specified which part of Texas Penal Code § 36.06 ("Obstruction and Retaliation") "he is supposed to have violated, who was obstructed, and why."

When we review a trial judge's decision to deny a motion to quash an indictment, we apply a *de novo* standard of review.[44] The right to notice is set forth in the Sixth Amendment of the United States Constitution and Article I, § 10 of the Texas Constitution.[45] A charging instrument must be specific enough to inform the accused of the nature of the accusation against him so that he may prepare a defense.[46] The Texas Code of Criminal Procedure prescribes that indictments must, in ordinary and concise language, state everything that is necessary to prove the offense charged "with that degree of certainty that will give the defendant notice of the particular offense with which he is charged."[47] This Court has observed that it is a "rare exception" when an indictment containing

---

[44] *Lawrence v. State*, 240 S.W.3d 912, 915 (Tex. Crim. App. 2007); *State v. Moff*, 154 S.W.3d 599, 601 (Tex. Crim. App. 2004).

[45] *Lawrence*, 240 S.W.3d at 916.

[46] *Moff*, 154 S.W.3d at 601.

[47] *See* TEX. CODE CRIM. PROC. art. 21.03 ("Everything should be stated in an indictment which is necessary to be proved."); *Id.* art. 21.04 ("The certainty required in an indictment is such as will enable the accused to plead the judgment that may be given upon it in bar of any prosecution for the same offense."); *Id.* art. 21.11 ("An indictment shall be deemed sufficient which charges the commission of the offense in ordinary and concise language in such a manner as to enable a person of common understanding to know what is meant, and with that degree of certainty that will give the defendant notice of the particular offense with which he is charged, and enable the court, on conviction, to pronounce the proper judgment."); *see also Moff*, 154 S.W.3d at 601.

the language of the penal statute is not legally sufficient to provide notice of the offense charged.[48]

However, "[a]lthough an indictment which tracks the language and terms of the statute is ordinarily sufficient, if the statutory language is not completely descriptive, so that particularity is required to afford the defendant notice as required, merely tracking the language of the statute may be insufficient."[49]

Nevertheless, the State is not required to plead evidentiary facts which are not essential to provide the requisite notice to the accused.[50] And this Court has "repeatedly held that an indictment need not allege the constituent elements of the underlying offense which elevates murder to capital murder."[51] In addition, not every inadequacy of notice requires reversal of a conviction. Instead, we examine whether, in the context of the case, the failure to provide notice affected "the defendant's ability to prepare a defense and, if so, how great an impact it was."[52] The due process notice requirement may be satisfied by means other than the language in the charging instrument. We have held that, "[w]hen a motion to quash [an indictment for lack of notice] is overruled, a defendant suffers no harm unless he did not, in fact, receive notice of the State's theory against

---

[48] *Daniels v. State*, 754 S.W.2d 214, 218 (Tex. Crim. App. 1988).

[49] *State v. Mays*, 967 S.W.2d 404, 407 (Tex. Crim. App. 1998); *Daniels*, 754 S.W.2d at 218.

[50] *Daniels*, 754 S.W.2d at 218.

[51] *Alba v. State*, 905 S.W.2d 581, 585 (Tex. Crim. App. 1995); *see also Ramirez v. State*, 815 S.W.2d 636, 642 (Tex. Crim. App. 1991) ("The indictment did not specifically allege which burglarious intent appellant had when he committed this offense, nor was the State required to plead the constituent elements of the offense constituting the aggravating feature of capital murder.").

[52] *Geter v. State*, 779 S.W.2d 403, 407 (Tex. Crim. App. 1989).

which he would have to defend."[53]

Davis's indictment provided in relevant part:

Defendant, [o]n or about the 6th day of September, 2012 in the County of Dallas and said State, did unlawfully then and there intentionally cause the death of SHANIA GRAY, an individual, hereinafter called deceased, by SHOOTING THE DECEASED WITH A FIREARM, A DEADLY WEAPON, AND BY ASPHYXIATING THE DECEASED, and the defendant was then and there in the course of committing and attempting to commit the offense of OBSTRUCTION.

At the pretrial hearing on the motion to quash, the court and counsel discussed a recent case in which the Dallas Court of Appeals held that a trial judge did not err in denying a defendant's motion to quash a capital murder indictment for failure to allege the elements of the underlying offense of obstruction/retaliation within the indictment.[54] Defense counsel conceded that this authority was "right on point" and contrary to the defense's arguments. The trial judge additionally asked defense counsel, "haven't you received notice of what the obstruction is through other pleadings and other discovery mechanisms . . . ?" Counsel responded: "Yes, in answer to your question, we've had - - we have discovery. We know what the State's position is in the case, and what it is that they believe happened and why. But we just - - our position is that we need to have that in the indictment so that we know specifically what it is we're defending against."

Davis argues that more detail should have been provided in the indictment in this case to describe the underlying offense of obstruction because Texas Penal Code § 36.06 has eight different elements with "distinct alternatives that may or may not be included in the indictment." However, other underlying offenses of capital murder, such as burglary, also have multiple elements and

---

[53] *Kellar v. State*, 108 S.W.3d 311, 313 (Tex. Crim. App. 2003)

[54] *See Moreno v. State*, No. 05-09-00700-CR (Tex. App.—Dallas May 11, 2011, no pet.) (not designated for publication) (holding that the State was not required to allege the constituent elements of the underlying offense of obstruction or retaliation in the indictment).

potential methods of commission. Davis cites no authority to support his argument that we should treat indictments in capital murder cases involving the underlying offense of obstruction differently from capital murders involving other underlying offenses. Moreover, any lack of detail in the indictment did not harm Davis because, as his counsel's statements to the trial judge reveal, the defense received actual notice of the State's theory of the case regarding the obstruction element.[55]

Davis, therefore, has not shown that the trial judge erred in denying his motion to quash the indictment. We overrule point of error five.

## MOTION FOR CONTINUANCE

In his sixth point of error, Davis contends the trial judge erred in denying his written motion for continuance filed on November 1, 2013. He argues that the denial of the motion for continuance violated his rights to due process of law and effective assistance of counsel under the Fourteenth and Sixth Amendments to the United States Constitution.

By the time Davis filed the motion for continuance that was denied, the trial judge had already granted two previous motions for continuance. On October 8, 2012, on defense counsel's oral motion, the trial judge reset the trial to August 19, 2013. On August 8, 2013, defense counsel filed a written motion for continuance stating that certain redacted government records showed it was "obvious that sexual abuse was occurring" in Davis's childhood home, though it was "not clear what kind of abuse, by whom, upon whom." In response to this motion, the trial judge postponed Davis's trial to November 4, 2013.

---

[55] *See Smith v. State*, 297 S.W.3d 260, 267 (Tex. Crim. App. 2009) ("The record in this case clearly shows that appellant had actual notice of the capital charge upon which the State was basing its allegations."); *Kellar*, 108 S.W.3d at 314 ("Given the extensive and detailed discovery that occurred prior to trial, the appellant had ample notice in addition to that provided by the indictment.").

Davis's November 1st motion for continuance stated in relevant part:

> It has come to the attention of defense counsel that the Defendant, Mr. Franklin Davis, has an extensive history of sexual abuse perpetrated upon him. New evidence has come to light as of the afternoon of October 31, 2013. This evidence is paramount to the effective representation of Mr. Davis. This evidence must be investigated for both guilt/innocence issues as well as possible mitigation evidence.

The November motion did not further explain the nature of the evidence, witnesses, or investigation needed, the diligence used to procure the evidence, or why the evidence could not be procured from another source, such as Davis himself. The copies of the motion and attached affidavit in the clerk's record were not signed by counsel or Davis. The only signature on the document is that of a notary public who, curiously, certified that defense counsel had signed the unsigned affidavit.

The trial judge observed that the motion was "filed literally at the 11th hour." The judge noted that nearly fourteen months had passed since the case had been first assigned to his district court and that he had already granted Davis two continuances. The judge said that Davis's August motion for continuance had stated essentially the same grounds as the instant motion: the need to investigate newly discovered mitigating evidence suggesting Davis had been sexually abused as a child. The judge also stated that Davis's latest motion did not comply with Article 29.07, governing subsequent motions for continuance by a defendant. The judge commented that the motion appeared to have been filed for the purpose of obtaining cumulative testimony.

Defense counsel responded that, on October 31, 2013, he was speaking with Davis during a visit and "things came to light about the defendant's past which only the defendant could be able to address specifically," and these "things" were not contained in the records that were the basis for the last motion for continuance. Counsel emphasized that "nobody else can testify directly as to what has happened to Mr. Davis himself . . . . [O]nly he can speak about the acts, about the things

that were done to him by the people who did them to him." Defense counsel explained that they wanted to explore the psychological impact of the childhood abuse on Davis.

The trial judge confirmed that defense counsel intended to direct their investigators to continue to investigate this issue throughout the week. The judge asked for daily reports on the status of that investigation. He then denied the motion for continuance. Subsequently during trial, before the State completed its presentation of evidence, the trial judge asked defense counsel about their progress on this investigation. Defense counsel asked to speak to the judge in camera about this matter. The judge then took a short recess. When the judge and parties returned to the courtroom, there was no further discussion of the matter on the record and defense counsel did not renew the request for a continuance.

An appellate court reviews a trial judge's ruling on a motion for continuance for an abuse of discretion.[56] To establish an abuse of discretion, an appellant must show that he was actually prejudiced by the denial of his motion.[57] Generally, we will conclude that a trial judge's denial of a motion for continuance was an abuse of discretion "only if the record shows with considerable specificity how the defendant was harmed by the absence of more preparation time than he actually had."[58] In determining whether the denial of a motion for continuance is so arbitrary that it violates due process, we look at the individual circumstances of each case, especially the reasons presented

---

[56] *See* TEX. CODE CRIM. PROC. art. 29.06 (providing that the sufficiency of a motion for continuance shall be addressed to the "sound discretion" of the court and "shall not be granted as matter of right"); *Heiselbetz v. State*, 906 S.W.2d 500, 511 (Tex. Crim. App. 1995).

[57] *Janecka v. State*, 937 S.W.2d 456, 468 (Tex. Crim. App. 1996).

[58] *Gonzales v. State*, 304 S.W.3d 838, 842 (Tex. Crim. App. 2010).

to the trial judge at the moment the motion was denied.[59]

Davis also argues that the trial judge's denial of his motion for continuance rendered his attorneys' performance constitutionally deficient on the issue of mitigation. To prevail on an ineffective assistance of counsel claim, a defendant must prove: (1) trial counsel's representation fell below an objective standard of reasonableness (i.e., deficient performance); and (2) there is a reasonable probability that, but for counsel's deficiency, the result of the proceeding would have been different (i.e., prejudice).[60] A defendant bears the burden of proving an ineffectiveness claim by a preponderance of the evidence.[61] A reviewing court need not always address both prongs of the inquiry, because the "[f]ailure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim."[62]

Texas Code of Criminal Procedure Article 29.08 provides that, "All motions for continuance must be sworn to by a person having personal knowledge of the facts relied on for the continuance." Article 29.07 requires that a defendant's subsequent motion for continuance must comply with all the requirements for a first motion for continuance set out in Article 29.06, and further must state: (1) that the testimony sought by the defense cannot be procured from any other source known to the defendant; and (2) that the defendant has a reasonable expectation of procuring the testimony "at the next term of the court." "Mere conclusions and general averments are not sufficient for the court to determine their materiality, and the motion for continuance must show on its face the materiality

---

[59] *Rosales v. State*, 841 S.W.2d 368, 374 (Tex. Crim. App. 1992).

[60] *Thompson v. State*, 9 S.W.3d 808, 812-13 (Tex. Crim. App. 1999); *see Strickland v. Washington*, 466 U.S. 668, 687 (1984).

[61] *Thompson*, 9 S.W.3d at 813.

[62] *Id*.

of the absent testimony."[63] A defendant forfeits his appellate challenge to the trial judge's denial of his continuance motion by failing to comply with the procedural requirements set out in these statutes.[64] We have refused to recognize a due process exception to the rule requiring motions for continuance to be written and sworn in order to be preserved on appeal.[65]

Davis's November 1st motion for continuance was not sworn to by any person with personal knowledge of the facts. Therefore, it did not comply with Article 29.08. In addition, as the trial judge observed, the motion did not comply with Article 29.07, in that it did not state that the testimony sought could not be procured from any other source known to the defendant or that the defendant had a reasonable expectation of procuring the evidence "at the next term of the court."

Further, the weight of the evidence in this case suggests that Davis did not suffer prejudice as a result of the denial of his motion for continuance, and no due process violation occurred. Although this case was undeniably complex, defense counsel and the defense investigator had over a year to prepare for trial. Davis had already received two continuances, including a lengthy continuance in part for the purpose of developing childhood sexual-assault evidence. There was no testimony establishing that defense counsel's performance was compromised or defense witnesses were inconvenienced by the judge's refusal to grant the third continuance. When the trial judge asked defense counsel during the trial about the status of their investigation into the alleged sexual abuse, counsel made no complaint on the record that the defense had not been able to progress in its

---

[63] *Harrison v. State*, 187 S.W.3d 429, 434 (Tex. Crim. App. 2005).

[64] *See Anderson v. State*, 301 S.W.3d 276, 280 (Tex. Crim. App. 2009) ("Anderson forfeited his appellate challenge to the trial judge's denial of his unsworn oral continuance motion by failing to comply with procedural requirements of Articles 29.03 and 29.08.").

[65] *See Blackshear v. State*, 385 S.W.3d 589, 591 (Tex. Crim. App. 2012) (citing *Anderson*, 301 S.W.3d at 279).

investigation, nor did he renew his request for a continuance. Moreover, defense counsel conceded that the testimony relevant to the November motion could only come from Davis himself. And when Davis took the stand in his own defense, he testified that he was "raped" by his grandfather and his "mentally retarded brother." The defense also offered other evidence documenting sexual abuse in Davis's childhood home.

Under the circumstances, Davis has not demonstrated that he was deprived of due process or the effective assistance of counsel. We conclude that the trial judge did not abuse his discretion in denying this motion for continuance, and we overrule Davis's sixth point of error.

## DENIAL OF MOTIONS TO SUPPRESS EVIDENCE

### *Search Warrants*

In his seventh, eighth, ninth, and tenth points of error, Davis contends that the trial judge erred in denying his motions to suppress evidence obtained as a result of four search warrants for: (1) photographs and a DNA buccal swab from Davis; (2) items from Arrington's 2005 Dodge Stratus; (3) items from Davis and Arrington's apartment in Irving, Texas; and (4) digital information from Davis's T-Mobile phone.

On September 8, 2012, a magistrate signed three search warrants authorizing the search of Davis's body for a DNA sample and photographs, Arrington's Dodge Stratus (which had been driven by Davis), and Davis and Arrington's apartment. At this time, officers had not yet found Gray's body and were investigating her disappearance as a kidnapping rather than a murder. Thus, the search warrants alleged the penal offense of kidnapping. These three search warrant affidavits contained the following factual allegations:

On Thursday, September 6, 2012, Shania Ambriehl Gray was last seen at Hebron High School at 4207 Plano Parkway, Carrollton, Denton County, Texas. She was attending an after school tutoring class and had received a telephone call from her mother. Shania Ambriehl Gray told her teacher that she was going to meet her mother, Sherry James. Shania left the classroom to walk out of the school and meet her mother, who was waiting in a car. Shania Ambriehl Gray never arrived at her mother's car and has not been seen since her tutoring class . . . .

During the course of the investigation, Officers discovered that in 2011, Shania Ambriehl Gray had reported several Sexual Assault cases to the Mesquite Police Department. The suspect, Franklin Davis, . . . was arrested and is currently awaiting trial for these offenses . . . .

Officers obtained Shania Ambriehl Gray's cellular telephone information due to exigent circumstances. While investigating the activity on Shania Ambriehl Gray's cellular telephone, officers found the telephone number 903-603-8786. During the time period from September 5, 2012 to September 6, 2012, several calls and texts were made from Shania Ambriehl Gray's cellular telephone to cellular telephone number 903-603-8786.

Officers obtained the cell data for 903-603-8786 due to exigent circumstances. One of the numbers called by 903-603-8786 was 214-909-8567. Officers called 214-909-8567 and spoke to Shakeema Morsley. Officers asked Shakeema Morsley if she could tell them who had been calling her from 903-603-8786. Shakeema Morsley said that she believed this person was Franklin Davis. Shakeema Morsley knows Franklin Davis through her friend and work associate, Jawanna Arrington, who is in a dating relationship with Franklin Davis. Shakeema stated that she strongly believed this was Franklin Davis due to the content of the communications, which would only be known to Franklin Davis.

Officers looked at the cellular telephone data for Shania Ambriehl Gray and the 903-603-8786 [sic], which is believed to belong to Franklin Davis, and found that they had been in proximity with each other during the same time frame on September 6, 2012. After 5:17 p.m. CST on September 6, 2012 it appears that Shania Ambriehl Gray's telephone was turned off.

The affiant further stated that Gray's mother said Gray had never run away from home, was not defiant or rebellious, and had indicated that she wanted to attend future school events and to "attain goals with her family," suggesting that it was unlikely that Gray had voluntarily left the school and run away without contacting her mother.

Officers executed the search warrant for Davis and Arrington's apartment on September 8,

2012. They seized two plastic bags of household trash, a black spiral notebook containing personal writings, miscellaneous paperwork, a black Adidas shirt, black basketball shorts, and a pair of weightlifting gloves. On September 10, 2012, officers executed the search warrant for the Dodge Stratus, seizing a bank withdrawal receipt, some trace evidence, fingerprints, and DNA swabs. Officers executed the warrant for Davis's DNA sample and photos on September 11, 2012. They obtained two buccal swabs and several photographs of Davis, including photos taken at the jail of an injury to his arm and his shirtless chest displaying a "Wish" tattoo.

The fourth search warrant affidavit was signed by Detective Williams on September 12, 2012, after officers found Gray's body and after Davis confessed to murdering Gray. Williams stated in the affidavit that Davis voluntarily gave his T-Mobile phone to officers at the Carrollton Police Department. Williams relied in large part on statements Davis had made during his interview with Detective Chevallier, in which Davis admitted taking Gray from her school, shooting her, and killing her. Williams said that Davis admitted in this interview that he adopted a false identity, used a prepaid cell phone to talk to Gray, and recorded those conversations on his T-Mobile phone. This warrant was used to obtain the contents of Davis's T-Mobile phone, including digital images, recordings, and internet search history.

Davis filed four motions to suppress all the evidence obtained through the four search warrants. He argued that the warrants, the associated affidavits, and the execution and return of the warrants violated his constitutional and statutory rights "under the Fourth and Fifth Amendments to the United States Constitution, Article I, Section 9 of the Texas Constitution, and Article 38.23" because the affidavits did not show probable cause to conclude that "the alleged contraband would be found in a particular place."

In the hearing on Davis's motions to suppress, Davis's counsel maintained that the search

warrant affidavits were deficient because they did not allege facts showing that a crime had been committed and did not allege that there was anything that could be used for comparison with Davis's DNA. Further, Davis's counsel argued that the affidavits did not establish any basis for the police "to believe that this individual, Shamica Mosley [sic], is credible or that what they [sic] tell them actually helps them in any way." He argued that the facts stated in the affidavits did not collectively amount to probable cause. Finally, he argued, without elaboration, that the fourth warrant affidavit relied on information unlawfully obtained through the first three search warrants.

The State responded that the affidavits alleged facts showing a kidnapping and that investigators reasonably expected to compare Davis's DNA to evidence obtained in the future. The prosecutor pointed out that Shakeema Morsley personally knew Davis and "strongly believe[d]" that he was the person who was using the 903 area-code number to contact her in September 2012. In the event that the trial judge felt that the motions to suppress had merit, the prosecutor asked to be allowed to call Arrington to testify that she gave consent to the searches of her Dodge Stratus and their apartment. At trial, Arrington testified that she consented to allowing the police to retain her Dodge Stratus for processing, but there is no indication that evidence establishing her consent to the search was before the magistrate when he signed the warrants or the trial judge when he ruled on the motions to suppress.

The trial judge entered findings of fact regarding Davis's motions to suppress evidence, including the following:

> 3.  . . . .  Detective D. Williams, who investigated the victim's disappearance, determined that the victim had previously reported several sexual assault cases to the Mesquite Police Department by the Defendant, Franklin B. Davis. Based on the existence of these charges, Detective D. Williams contacted Detective Cook to assist with the investigation.

4. The victim's mother informed the officers that the victim has never before run away from home, even during the time that led up to her outcry about the alleged sexual assaults by the Defendant. Her mother also indicated that she has never been defiant or rebellious and that she had plans to attend future school events and to attain goals with her family. Based on this information, the officers surmised that the victim did not leave the school voluntarily.

5. Detective Cook, an experienced and seasoned officer, along with other officers then obtained the cell phone records of the victim, including those calls made or received the day before and the day of her disappearance. On both the day before and the day of her disappearance the victim made several calls and texts to a cellular number with a 903 area code. Officers then obtained the cell phone data for the cell phone with the 903 area code and found that this phone had made phone calls to a 214 phone number. The Officers contacted the owner of the 214 area code cell and determined that Shakeema Morsley, [sic] was the owner of the 214 area code phone. Ms. Morsley informed officers that she had been receiving phone calls from Franklin Davis on the 903 area code phone. Ms. Morsley knew the identity of Franklin Davis because, at the time, he was dating a friend and work associate of Ms. Morsley. Ms. Morsley based her identification of the Defendant on the content of the communications with him.

6. Officers, while looking at the cellular phone data for the cell phone of the victim and that of the Defendant, determined that the phones were in close proximity to each other during the same time frame on the date of the victim's disappearance.

Concluding that the affidavits stated probable cause supporting the search warrants, the judge denied the motions to suppress the photographs of Davis, the items seized from the Dodge Stratus, the items seized from the apartment, and the contents of Davis's T-Mobile phone. The judge found that the affidavit for the search warrant for Davis's DNA sample did not provide probable cause for obtaining the buccal swabs specifically, though the judge found that the affidavit did set forth "sufficient facts to establish probable cause to show that . . . a specific offense had been committed." Thus, the judge ruled that the DNA buccal swab evidence would not be admitted at trial.

We have recently set out the law relating to the probable cause required for the issuance of a search warrant:

The Fourth Amendment to the United States Constitution mandates that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and

particularly describing the place to be searched, and the persons or things to be seized." Probable cause exists when, under the totality of the circumstances, there is a fair probability or substantial chance that contraband or evidence of a crime will be found at the specified location. It is a flexible and nondemanding standard.[66]

We also set forth the standard of review applicable to a trial judge's ruling on a motion to suppress evidence:

While an appellate court typically reviews a trial judge's motion-to- suppress ruling under a bifurcated standard, a trial court's determination whether probable cause exists to support a search warrant's issuance is constrained solely to the affidavit's four corners. When we review a magistrate's decision to issue a warrant, we apply a highly deferential standard of review because of the constitutional preference for searches conducted pursuant to a warrant over warrantless searches. Provided the magistrate had a substantial basis for concluding that probable cause existed, we will uphold the magistrate's probable-cause determination. The magistrate may interpret the affidavit in a non-technical, common-sense manner and may draw reasonable inferences solely from the facts and circumstances contained within the affidavit's four corners. Appellate courts should not invalidate a warrant by interpreting the affidavit in a hypertechnical, rather than a common-sense, manner. When in doubt, the appellate court should defer to all reasonable inferences that the magistrate could have made.[67]

If a trial judge's ruling regarding a motion to suppress is reasonably supported by the record and is correct under any theory of law applicable to the case, the reviewing court must affirm it.[68]

Davis contends on appeal that the affidavits associated with the search warrants for the DNA sample and photographs, the Dodge Stratus, and the apartment did not set out sufficient facts connecting him to Gray's disappearance. He argues that the only connection between him and Gray's disappearance found in the four corners of the affidavits, other than the ongoing sexual assault case, was the statement of Shakeema Morsley, a coworker of Arrington. Davis argues

---

[66] *Bonds v. State*, 403 S.W.3d 867, 872-73 (Tex. Crim. App. 2013) (internal citations omitted).

[67] *Id*. at 873 (internal citations omitted).

[68] *Young*, 283 S.W.3d at 873.

Morsley's identification of him as the person who contacted her using the 903 area-code number was not reliable. He complains Morsley merely deduced that he was the person who contacted her based on the content of their "communications."

Davis analogizes the information Morsley provided to a tip from an anonymous informant. He emphasizes that the affidavit refers to a single telephone conversation between police and Morsley in which "no one has any knowledge of who the person is that identifies themselves as Ms. Morsley." He contends that the information she provided must be corroborated because the record suggests that she was not truthful, accurate, or reliable. Specifically, Davis points to the fact that Morsley described his relationship with Arrington as a "dating relationship," when he and Arrington were actually married. Therefore, he argues, the trial judge should have suppressed the evidence obtained from these three warrants.

Tips obtained "from anonymous or first-time confidential informants of unknown reliability must be coupled with facts from which an inference may be drawn that the informant is credible or that his information is reliable."[69] However, this requirement does not apply to information obtained from citizens who freely share the information with police without withholding their names.[70] The latter type of witness, sometimes referred to as a "citizen-informer," is "presumed to speak with the voice of honesty and accuracy."[71]

---

[69] *State v. Duarte*, 389 S.W.3d 349, 357 (Tex. Crim. App. 2012).

[70] *West v. State*, 720 S.W.2d 511, 513 n.2 (Tex. Crim. App. 1986) ("We decline the invitation to view with the same suspicion usually reserved for anonymous police informants with an unproven record of reliability information given by citizens who report a crime then freely share what information they have with police without withholding their own names.").

[71] *Duarte*, 389 S.W.3d at 356; *see also Esco v. State*, 668 S.W.2d 358, 360-61 (Tex. Crim. App. 1982) ("As the Court has consistently stated, where a named informant is a private

(continued...)

Morsley displayed none of the characteristics that we have held to render anonymous informants suspect. Her involvement with this case was happenstance, based on the fact that Davis chose to contact her, on or near the day Gray was abducted and killed, using the same phone with which he contacted Gray. Morsley did not insist on remaining anonymous and, in fact, freely identified herself by name when an officer called her on her phone. The affidavit contains her name and her phone number. Davis has pointed to no evidence suggesting that Morsley had any motive to falsely identify herself, to falsely implicate him, or to mislead police in their investigation. Therefore, Morsley is the type of citizen informer to whom we generally accord a presumption of honesty and reliability. We see no reason to abandon this presumption in this case.

Further, contrary to Davis's assertions, Morsley's identification of the 903 caller through the content of their conversations, which would be known only to Davis, was not inherently unreliable. We have long held that, when the content of a telephone conversation is offered into evidence, "the identity of the speaker is sufficiently established if the message reveals that the speaker has knowledge of facts that only the speaker would be likely to know."[72]

Moreover, Detective Cook's statement, that Morsley indicated that Davis and Arrington were in a "dating relationship," did not render the information that Morsley provided unreliable. The record reflects that Davis and Arrington had only been married for approximately one month when he was arrested for the sexual assaults. Evidence elsewhere in the trial record shows that Morsley told the detectives about Arrington's marriage to Davis. This fact suggests that the failure to

---

[71](...continued)
citizen whose only contact with the police is a result of having witnessed a criminal act committed by another, the credibility and reliability of the information is inherent.").

[72] *Earnhart v. State*, 582 S.W.2d 444, 448-49 (Tex. Crim. App. 1979).

mention their marriage in the affidavit was an oversight on the affiant's part rather than a misstatement by Morsley.[73] However, this information was not known to the magistrate when he signed these warrants, and we do not consider it in our review of the magistrate's assessment of probable cause. In any case, the reference to Arrington and Davis having a dating relationship was not integral to the probable-cause determination. The affidavits made it clear that Morsley knew Davis through her friend and coworker, Arrington, and was able to deduce from the content of their conversations that he was the person using the 903 phone number.

In addition to Morsley's identification of Davis as the 903 caller, the affidavits informed the magistrate that Gray had disappeared suddenly from her high school campus, even though her mother was waiting for her in front of the school. She was not a defiant child and had never before run away from home. She had reported to the Mesquite Police Department that Davis had sexually assaulted her on several occasions. Davis had been arrested on those charges, and he was awaiting trial on them when Gray disappeared. Gray communicated through calls and text messages with the 903 number on the day of her disappearance and the previous day. Telephone records also showed that the 903 phone and Gray's phone had been in proximity to each other when some of those communications occurred. Under the circumstances, the magistrate had a substantial basis for concluding that probable cause existed to suspect that Gray had been kidnapped, that Davis was involved in her abduction, and that evidence of that crime might be found in his apartment or in the vehicle he drove. We conclude that the trial judge did not err in finding that these search warrant affidavits stated probable cause.

---

[73] *See Dancy v. State*, 728 S.W.2d 772, 783 (Tex. Crim. App. 1987) ("A misstatement in an affidavit that is merely the result of simple negligence or inadvertence, as opposed to reckless disregard for the truth, will not render invalid the warrant based on it.").

Further, the only evidence obtained through the execution of the search warrant for the DNA sample and photos was the buccal swabs and the photographs of Davis that were taken in the jail. The trial judge granted Davis's motion to suppress the buccal swab evidence, and defense counsel affirmatively stated "no objection" when the State offered the photographs of Davis at trial. Even when the witness described the particular photographs, defense counsel did not object or refer to his pretrial motion to suppress. Under these circumstances, Davis has waived any error in their admission.[74]

After Gray's body was recovered, authorities obtained a search warrant for the digital contents of Davis's T-Mobile phone. Davis argues this warrant was invalid because the accompanying affidavit was based on officers' conversations with him which "pertained directly to" evidence secured through executing the first three warrants. Davis, however, specifies no particular facts or evidence, and provides no further explanation of what information in this affidavit was allegedly derived from evidence seized in the first three searches. Thus, he has not adequately briefed this claim.[75]

In any event, the warrant affidavit contains ample probable cause independent of any evidence obtained through the execution of the first three warrants.[76] The affiant, Detective

---

[74] *See Thomas v. State*, 408 S.W.3d 877, 885-86 (Tex. Crim. App. 2013) ("[I]f from the record as a whole the appellate court simply cannot tell whether an abandonment was intended or understood, then, consistent with prior case law, it should regard the 'no objection' statement to be a waiver of the earlier-preserved error . . . . [T]he affirmative 'no objection' statement will, by itself, serve as an unequivocal indication that a waiver was both intended and understood.").

[75] *See* TEX. R. APP. P. 38.1; *see also Busby v. State*, 253 S.W.3d 661, 673 (Tex. Crim. App. 2008) (holding that this Court has no obligation to "construct and compose" a party's "issues, facts, and arguments with appropriate citations to authorities and to the record").

[76] *See Brown v. State*, 605 S.W.2d 572, 577 (Tex. Crim. App. 1980) ("[I]n cases where
(continued...)

Williams, relied in large part on statements made by Davis in his interviews with detectives. In these interviews, Davis described the text messages on his T-Mobile phone—later shown to have been generated by the fake text message application—and stated that he used his phone to record conversations he had with Gray. In subsequent interviews, Davis confessed that he took Gray from Hebron High School, shot her twice, and stepped on her neck. Therefore, the magistrate reasonably surmised that Davis had murdered Gray and that evidence relevant to the murder would be found on his T-Mobile phone.

The trial judge did not err in denying Davis's motions to suppress the evidence obtained through the execution of these search warrants. We overrule Davis's seventh, eighth, ninth, and tenth points of error.

### Photographs of Gray's Body

In Davis's twelfth point of error, he complains that the trial judge erred in overruling his objections to State's Exhibits 40 and 41, which are photographs of Gray's body. When the State offered these exhibits, counsel argued that they were prejudicial and did not have probative value. Counsel asked the trial judge to "do a 403 balancing test" with regard to these two photos.[77] The judge viewed the photos, stated that he found that their probative value substantially outweighed their prejudicial effect, and overruled counsel's objection.

Davis argues on appeal that these two photographs, which depict Gray's body floating in the river face down, were "extremely gruesome." He asserts that the trial judge erred in allowing the

---

[76](...continued)
search warrants have been issued on the basis of an affidavit that included tainted information, . . . the warrant is nonetheless valid if it clearly could have been issued on the basis of the untainted information in the affidavit.").

[77] See TEX. R. EVID. 403.

State to introduce them because their introduction was "meant to appeal to emotion rather than the fact[-]finding process." He also contends that the prejudicial effect of these photographs "far outweighed any possible probative value." He emphasizes that Gray's cause of death was not controverted in this case.

The admissibility of a photograph is within the sound discretion of the trial judge.[78] We have held that a photograph is generally admissible if verbal testimony as to matters depicted in the photographs is also admissible.[79] In other words, if verbal testimony is relevant, photographs of the same subject matter are also most likely relevant.[80] Davis did not dispute the cause of death in this case and admitted killing Gray. Nevertheless, his plea of "not guilty" to capital murder placed every element of the offense in issue.[81] Despite a defendant's admission of various elemental facts, when he pleads "not guilty," the State retains the right—and indeed the burden—to endeavor to prove the essential elements of the offense, including the victim's cause of death, beyond a reasonable doubt.[82]

At the time of trial, Rule 403 provided, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of

---

[78] *Sonnier v. State*, 913 S.W.2d 511, 518 (Tex. Crim. App. 1995).

[79] *See Williams v. State*, 958 S.W.2d 186, 195 (Tex. Crim. App. 1997).

[80] *See Emery v. State*, 881 S.W.2d 702, 710 (Tex. Crim. App. 1994).

[81] *See* TEX. CODE CRIM. PROC. art. 27.17 ("The plea of not guilty shall be construed to be a denial of every material allegation in the indictment or information.").

[82] *See Old Chief v. United States*, 519 U.S. 172, 186-87 (1997) ("[T]he prosecution is entitled to prove its case by evidence of its own choice, or, more exactly . . . a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it.").

cumulative evidence." Once a Rule 403 objection has been made, the trial judge is called upon to weigh the probative value of the evidence against its potential for "unfair prejudice."[83] Rule 403 favors the admissibility of relevant evidence.[84]

A trial judge may consider several factors in determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice. These factors include the number of exhibits offered, their gruesomeness, their detail, their size, whether they are black and white or color, whether they are close-up, whether the body depicted is naked or clothed, and the availability of other means of proof.[85] Testimony and photographs of the crime scene can aid the jurors in determining facts such as the manner and means of the victim's death and the force used.[86]

The two photographs at issue appear to be approximately eight by ten inches in size. They reveal the condition of Gray's torso, her hair braids, and the clothes she was wearing when the officer discovered her floating face down in the river. These photos are not unduly bloody or gruesome. Gray is clothed and the photos do not show any part of her face or provide a close-up perspective of her wounds. These two photographs essentially illustrate factual details concerning Gray's appearance, circumstances, location, and cause of death that the State also introduced through the testimony of the officer who found the body and various other witnesses.[87] Davis argued that two other photos (State's Exhibits 38 and 39), which were admitted without objection, adequately

---

[83] *Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Crim. App. 1991) (op. on reh'g).

[84] *Long v. State*, 823 S.W.2d 259, 271 (Tex. Crim. App. 1991) (citing *Montgomery*, 810 S.W.2d at 389).

[85] *Williams*, 958 S.W.2d at 196.

[86] *Id.* at 195.

[87] *See Williams v. State*, 301 S.W.3d 675, 693 (Tex. Crim. App. 2009).

showed the terrain where the body was found and thus Exhibits 40 and 41 added no probative value.

However, in Exhibits 38 and 39, Gray's body was distant and not clearly identifiable.

Davis refers us to our opinion in *Wyatt v. State*,[88] but *Wyatt* does not support his contentions.

In *Wyatt*, we held that a trial judge did not err in admitting two pictures of the deceased child

victim's anus. We noted that the photos showed the victim's injuries and corroborated the

appellant's confession.[89] In this case, the complained-of photos similarly corroborated both the

investigating officers' testimony and Davis's confession, in which he admitted shooting Gray in a

park along the river and then rolling her into the river.

To the extent that Gray's gunshot wound is visible and her body appears bloated in these

images, these aspects of the condition of the body were the direct result of Davis's actions. We have

held that, "when the power of the visible evidence emanates from nothing more than what the

defendant has himself done we cannot hold that the trial court has abused its discretion merely

because it admitted the evidence."[90]

Under the circumstances, the trial judge did not abuse his discretion in deciding that the

probative value of the photographs substantially outweighed any danger of unfair prejudice. Davis's

twelfth point of error is overruled.

EXCLUSION OF EVIDENCE

In points of error thirteen through eighteen, Davis complains that the trial judge erred in

sustaining the State's objections and refusing to admit certain recordings, which Davis refers to as

---

[88] 23 S.W.3d 18 (Tex. Crim. App. 2000).

[89] *Id*. at 29.

[90] *Sonnier*, 913 S.W.2d at 519.

Defense Exhibits A, B, C, E, F, and G. (Davis does not contest the trial judge's exclusion of Defense Exhibit D.) Before Davis's counsel offered these exhibits, the State had offered into evidence—and played for the jury—a recording of a telephone conversation between Davis, posing as a young man known as "D," and Gray (State's Exhibit 19A). Davis had secretly recorded the conversation using his T-Mobile phone while speaking with Gray on the go phone he had purchased. In State's Exhibit 19A, "D" and Gray discussed the sexual assaults committed against Gray and their impact on Gray's life. Defense Exhibits A, B, C, E, F, and G were other surreptitiously-recorded telephone conversations between Gray and Davis (pretending to be "D") that were stored on Davis's T-Mobile phone. Davis argues that the judge's refusal to admit these exhibits denied him his constitutional right to due process and a fair trial.

The record initially received by this Court did not contain any exhibits labeled as Defense Exhibits A, B, C, E, F, and G that matched the descriptions of the complained-of recordings in the parties' briefs and the reporter's record. Upon a request by this Court for the exhibits at issue, the Dallas County Clerk's Office submitted State's Exhibit 18, a DVD which was admitted by the trial judge "for record purposes" only at trial. State's Exhibit 18 contains an electronic file folder of recordings that match the descriptions of the complained-of defense exhibits, though the recordings are not labeled as Defense Exhibits A, B, C, E, F, or G. We will assume that the recordings contained in State's Exhibit 18 are the exhibits Davis complains were erroneously excluded from evidence.[91]

---

[91] *See* TEX. R. APP. P. 34.6(d) ("If anything relevant is omitted from the reporter's record, the trial court, the appellate court, or any party may by letter direct the official court reporter to prepare, certify, and file in the appellate court a supplemental reporter's record containing the omitted items. Any supplemental reporter's record is part of the appellate record."); *see also Amador v. State*, 221 S.W.3d 666, 675 (Tex. Crim. App. 2007) ("It was, however, appellant's

(continued...)

In these recordings, Gray and "D" do not discuss the sexual assaults or Davis, but they do discuss Gray's romantic involvement with other men and other unrelated matters. Many of Gray's statements are not clearly audible or intelligible.

The record reflects that, during the cross-examination of Detective Williams, defense counsel attempted to offer these recordings into evidence and the prosecutor objected. Defense counsel responded that the recordings were relevant to statements made by Gray during the DCAC interview that "the first time she ever had sex was with Franklin Davis." The prosecutor disputed this assertion. The trial judge asked the parties to try to "work something out" over the lunch hour. They returned from lunch without reconciling their differences regarding the admissibility of these items. The prosecutor then made specific objections to the six defense exhibits, including objections on the basis of hearsay, lack of relevance, and violations of Rules 403 and 412. The trial judge considered counsel's arguments as to each of the six exhibits and ultimately sustained the State's objections with regard to all of them.[92] Defense counsel then offered all of these exhibits "for the record" and the trial judge admitted them for that limited purpose.

On appeal, Davis argues that all six of these recordings should have been admitted under Texas Code of Criminal Procedure Article 38.36(a) to explain the circumstances surrounding the killing. In relevant part, Article 38.36(a) provides:

---

[91](...continued)
burden to bring forward a record on appeal sufficient to show that the trial court erred in his ruling on the motion to suppress."); *Rowell v. State*, 66 S.W.3d 279, 282-83 (Tex. Crim. App. 2001) ("The rule permits and requires each party to see that the reporter's record contains all that the appellate court needs," and "the court of appeals was permitted to decide this appeal on the basis of the record that the parties chose to file.").

[92] *See Alford v. State*, 400 S.W.3d 924, 929 (Tex. Crim. App. 2013) ("[W]e uphold the trial court's ruling under any applicable theory of law supported by the facts of the case.").

> In all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.

As a prerequisite to presenting a complaint for appellate review, the record must show that the party "stated the grounds for the ruling that [he] sought from the trial court with sufficient specificity to make the trial court aware of the complaint."[93] Further, we have held that "it is not enough to tell the judge that evidence is admissible. The proponent, if he is the losing party on appeal, must have told the judge why the evidence was admissible."[94] Davis did not mention Article 38.36(a) when he argued for the admission of these recordings at trial. Although he argued that the evidence would reveal Gray's state of mind, he did not say that the proffered recordings concerned his previous relationship with Gray or the condition of his mind at the time of the offense. Therefore, his Article 38.36(a) claim on appeal does not comport with his arguments at trial and he did not properly preserve this claim for our review.[95]

Further, evidence which is admissible under Article 38.36(a) may nevertheless be excluded if its admission would violate Rule 403.[96] The proffered recordings did not include any discussion of the sexual-assault charges or reveal that Gray had any motive to testify falsely against Davis. The trial judge could have reasonably concluded that this evidence was not material to the charged

---

[93] Tex. R. App. P. 33.1.

[94] *Reyna v. State*, 168 S.W.3d 173, 177 (Tex. Crim. App. 2005).

[95] *See* Tex. R. App. P. 33.1(a).

[96] *See Smith v. State*, 5 S.W.3d 673, 679 (Tex. Crim. App. 1999); *Jackson v. State*, 160 S.W.3d 568, 574 (Tex. Crim. App. 2005) ("[In] *Smith v. State* . . . we stated that evidence admissible under Article 38.36(a) may be excluded under Rule 403.").

offense and its probative value was low. Morever, because the conversations in the recordings touched on Gray's other sexual partners, her family life, and personal matters unrelated to the offense at bar, the judge could have reasonably concluded that the danger of unfair prejudice, confusing the issues, misleading the jury, and undue delay was high. Davis essentially admitted during cross-examination that a key purpose for offering these recordings was to impugn Gray's character by revealing to the jury her sexual conduct with other men. The inflammatory and prejudicial nature of this evidence substantially outweighed any minimal probative value it may have had.

Davis also cites *Saunders v. State*,[97] in which the Dallas Court of Appeals held under the predecessor statute to Article 38.36 that the trial judge erred in excluding evidence of aggressive conduct by the deceased against the defendant and words exchanged between them immediately before the killing. Saunders offered that evidence at the punishment phase of the trial to explain the circumstances surrounding the murder. Davis suggests that, like Saunders, he did not offer Gray's statements in the recordings for the truth of the matters asserted therein, but rather as proof that she made the statements and to explain the circumstances surrounding the killing. Again, Davis did not cite this case or the referenced statute as a ground for admitting the evidence at trial. Therefore, he failed to preserve error.[98]

Additionally, *Saunders* is markedly distinguishable from the case at hand. The recordings at issue were made weeks before Davis killed Gray. They do not include any discussion of Gray's relationship with Davis, evidence of an altercation between Davis and Gray, or any motive or bias

---

[97] 687 S.W.2d 60 (Tex. App.—Dallas 1985, pet. ref'd).

[98] *See also McQuarrie*, 380 S.W.3d at 153 (stating that this Court is not bound by decisions of courts of appeals).

Gray may have had against Davis. In short, the statements made by Gray in these recordings do not illuminate the immediate circumstances surrounding Gray's murder. Further, Davis's testimony at trial suggests that he intended to offer at least some of the remarks in the recordings for the truth of the matters asserted. For example, he wanted the jury to believe the statements in these recordings that Gray had sexual relationships with other men. By definition, the exhibits contained inadmissible hearsay.[99]

With regard to Exhibit A, Davis insists that the exhibit was not submitted for the truth of the matters asserted, but to show "[Gray's] state of mind concerning her mindset as to its preoccupation with sexual activity and contributed to show how she fabricated the accusations of sexual misconduct" against him. Other than Gray's pre-recorded voicemail greeting, Davis's statement announcing that he was calling Gray in order to "pretty much prove [his] innocence in this charge" comprises the only substantive spoken content on this recording. As such, this exhibit consisted primarily of a self-serving, out-of-court statement by Davis offered for the truth of the matter asserted, i.e., his assertion that he was innocent of the sexual assault charges. The recording does not contain any statement by Gray about her "then-existing state of mind" or her "emotional, sensory, or physical condition."[100] Also, defense counsel did not respond to the State's hearsay objection by informing the trial judge that he was not offering the exhibit for the truth of the matter asserted. Davis's claim on appeal again does not comport with his argument at trial.[101]

With respect to the other exhibits at issue, Davis simply reproduces verbatim several pages

---

[99] *See* TEX. R. EVID. 801, 802.

[100] *See* TEX. R. EVID. 803(3).

[101] *See* TEX. R. APP. P. 33.1(a).

from the reporter's record without elaboration on trial counsel's legal arguments. To the extent that Davis repeats trial counsel's objections without further argument or citation, these claims are inadequately briefed.[102]

We conclude that the trial judge did not abuse his discretion in excluding the recordings and Davis has not demonstrated any due process violation. However, even if the trial judge had erred in excluding this evidence, Davis was not harmed by the judge's ruling because the information Davis sought to impart to the jury was admitted elsewhere.[103] During cross-examination, the prosecutor invited Davis to inform the jury of the "important" content of the excluded recordings. Davis then testified without objection that Gray had sex with a boy while she was supposed to be at a track meet, had a sexual relationship with a twenty-year-old man who was in the Army, and had sex when she was thirteen years old. We overrule Davis's thirteenth, fourteenth, fifteenth, sixteenth, seventeenth, and eighteenth points of error.

In Davis's nineteenth, twentieth, and twenty-first points of error, he argues that the trial judge erred in sustaining the State's objections to testimony from defense witnesses Pastor Arty Hayes, Ashlye Sams, and Lamar Leggiton. Davis complains that the trial judge abused his discretion in preventing these witnesses from testifying about his prior consistent statements. Davis contends that

---

[102] TEX. R. APP. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."); *Busby*, 253 S.W.3d at 673.

[103] *See* TEX. R. APP. P. 44.2(b); *see also Brandley v. State*, 691 S.W.2d 699, 707 (Tex. Crim. App. 1985) (where appellant claimed error based on the exclusion of items found in a car, any error was held to be harmless where a witness's testimony established exactly what was found in the car, with the exception of one item); *Womble v. State*, 618 S.W.2d 59, 62 (Tex. Crim. App. 1981) ("We agree the statement was not admissible . . . but if we be wrong, the error was harmless. This court has consistently held reversal is not required by exclusion of evidence where the same testimony was later admitted without objection.").

the proffered out-of-court statements were not hearsay and were admissible under Rule 801(e)(1)(B).

Rule 613(c) mandates that a prior consistent statement of a witness "is inadmissible except as provided in Rule 801(e)(1)(B)." Rule 613(c) essentially codifies the common law rule against "bolstering," which prohibits "the use of prior consistent statements of a witness for the sole purpose of enhancing his credibility."[104] Rule 801(e)(1)(B) provides that a statement is not hearsay if the declarant testifies at trial and is subject to cross-examination, and the statement is "consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive."

Reviewing courts employ a four-prong test to determine whether a prior consistent statement is admissible under Rule 801(e)(1)(B):

(1) the declarant must testify at trial and be subject to cross-examination;

(2) there must be an express or implied charge of recent fabrication or improper influence or motive of the declarant's testimony by the opponent;

(3) the proponent must offer a prior statement that is consistent with the declarant's challenged in-court testimony; and,

(4) the prior consistent statement must be made prior to the time that the alleged motive to falsify arose.[105]

To determine whether the cross-examination of a witness raises an implied charge of recent fabrication or improper motive, the reviewing court focuses on the "purpose of the impeaching party,

---

[104] *See Rivas v. State*, 275 S.W.3d 880, 886 (Tex. Crim. App. 2009).

[105] *Hammons v. State*, 239 S.W.3d 798, 804 (Tex. Crim. App. 2007) (citing *Tome v. United States*, 513 U.S. 150, 156-58 (1995))*.*

the surrounding circumstances, and the interpretation put on them by the [trial] court."[106] This Court has explained that, although Rule 801(e)(1)(B) allows for the admission of prior consistent statements to rebut allegations of improper influence or motive, a "statement made after the alleged motive to fabricate arose does not rebut the allegation."[107] We review the trial judge's determination whether a prior consistent statement is admissible for abuse of discretion.[108] The trial judge's decision will be upheld if it falls within the zone of reasonable disagreement.[109]

Defense counsel informed the trial judge that he anticipated Pastor Hayes would testify "about what Franklin Davis did in the meantime after the sexual assaults arose but before the murder case and what [Hayes] had done to counsel [Davis], what he had talked about with [Davis]." The judge asked defense counsel, "How is the [witness] talking with the defendant not being offered by the defendant and therefore subject to [the] hearsay rule?" Defense counsel responded that the defense would not ask specifically what was said, but "what exactly happened." Counsel explained: "We don't believe it's hearsay because it's his statements about exactly what he was going through firsthand from the defendant." Counsel further asserted that the proffer met each of the four prongs in the test set out in *Hammons v. State*.[110] With regard to the fourth prong, he specifically argued that the prior consistent statements were made "prior to the time that the supposed motive to falsify arose, which was the murder charge."

---

[106] *Id.* at 808.

[107] *Haughton v. State*, 805 S.W.2d 405, 408 (Tex. Crim. App. 1990).

[108] *Hammons*, 239 S.W.3d at 806.

[109] *See Montgomery*, 810 S.W.2d at 390-92.

[110] *Hammons*, 239 S.W.3d at 808.

The prosecutor objected that the defendant's prior out-of-court declarations of innocence were hearsay, and disputed whether the defense had met the required predicate to offer them as prior consistent statements: "These denials have been throughout, so there's no recent fabrication aspect to it." The prosecutor further objected on the basis of relevance to Hayes's anticipated testimony about Davis receiving counseling. The trial judge overruled the State's relevance objection and allowed Hayes to testify about providing counseling to Davis. However, he sustained the State's predicate objection and ruled that Hayes would not be permitted to testify about Davis's prior consistent statements.

The judge allowed the defense to put on an offer of proof showing the prior consistent statement that Hayes would have recounted. Hayes testified outside the presence of the jury that he was Davis's sister's husband. He said he had counseled Davis when Davis came to him for guidance after being accused of four counts of sexual assault. Hayes said Davis told him that he did not commit the sexual assaults. The trial judge warned Hayes not to testify before the jury about Davis's claims that he was innocent of the sexual assault charges.

However, Hayes then testified before the jury not only about providing counseling to Davis concerning the pending sexual assault charges, but also about Davis's claims of innocence. Specifically, Hayes testified that, when Davis came to him for counseling after being accused of the sexual assaults, "he was very disturbed about the situation and . . . just wanted to speak with us on it and—and let us know, you know that[, ']I—I'm innocent[,] man. I'm innocent.'" The State did not object to this testimony. The trial judge reprimanded the witness for testifying to matters he had been warned not to speak about and cautioned him not to "do it again," but did not instruct the jury to disregard this testimony. Hayes went on to testify that he and another pastor had prayed with

Davis and his wife over this difficult situation and indicated that he felt sorry for Davis.

Ashlye Sams testified outside the presence of the jury that she had known Davis all of her life. She said that Davis told her that he did not commit the sexual assaults. Lamar Leggiton testified outside the presence of the jury that Davis was his best friend. He said that Davis told him he was not guilty of the sexual assault charges. Leggiton further stated that Davis seemed more and more distraught as time progressed. Davis could not find a job due to the pending sexual assault charges and he was afraid of losing his wife. The prosecutor objected that the defense had failed to lay a proper predicate for the prior consistent statements.

The judge sustained the State's objections to Sams's testimony in total and to the prior consistent statements that Leggiton proposed to relay. The judge ruled that the defense would be permitted to offer Leggiton's other testimony concerning Davis's increasingly distraught mental state and his various stressors, noting that this evidence supported the defensive theory in the case. The trial judge then granted defense counsel's request for time to confer. Following an off-the-record discussion, the defense proceeded with the presentation of unrelated evidence and then rested without calling Leggiton to testify.

None of these proffered statements met the fourth prong of the *Hammons* test because they were not made "prior to the time that the supposed motive to falsify arose."[111] First, the proffered statements from these three witnesses were self-serving protestations by Davis that he was innocent of the sexual-assault charges, not the murder charge. Thus, the relevant motive to fabricate arose when Davis became aware of the sexual-assault allegations against him, not when he was charged with murder. The record reflects that Davis made the statements to Hayes, Sams, and Leggiton after

---

[111] *See Haughton*, 805 S.W.2d at 408.

he was charged with the four sexual assaults, not after he was charged with the murder—the event that Davis relies upon to define when the motive to fabricate arose.

Morever, even assuming that the trial judge erred in excluding the proffered testimony, that error was effectively cured when Hayes violated the judge's instructions and informed the jury of Davis's protestations of innocence. Hayes's testimony before the jury, which was admitted without objection, was substantially equivalent to the testimony Hayes gave outside the jury's presence and was very similar to the prior consistent statements that the defense anticipated eliciting from Sams and Leggiton. Under the circumstances, any error in excluding the testimony from these witnesses was harmless.[112]

We overrule Davis's nineteenth, twentieth, and twenty-first points of error.

### "ANTI-SPECULATION" JURY CHARGE

In his twenty-second point of error, Davis contends that the trial judge erred in refusing his request for a charge on "anti-speculation" during the guilt-innocence stage of the trial. He argues that his proposed charge was a correct statement of the law prohibiting jurors from reaching their verdict based on speculation and contends the judge violated his due process rights in denying his request. Davis argues that the specific "anti-speculation" language that he requested was necessary to accurately guide the jury in its deliberations. He relies on this Court's decision in *Hooper v.*

---

[112] *See Mosley v. State*, 983 S.W.2d 249, 258 (Tex. Crim. App. 1998) (op. on reh'g) (explaining that harm from erroneous exclusion of evidence may be mitigated by admission of evidence similar to excluded evidence, and finding no harm where excluded testimony was not "different or more powerful than that of other witnesses that actually testified"); *Womble*, 618 S.W.2d at 62.

*State*[113] and also intermediate appellate court opinions including *King v. State*,[114] *Reese v. State*,[115] and *Thomas v. State*.[116]

After the parties rested and closed at the guilt-innocence stage of trial, defense counsel requested that an instruction be added to the proposed jury charge, specifically, "a charge on anti-speculation." The prosecutor expressed confusion about what charge counsel was requesting. Defense counsel responded: "The language would be a charge to the jury [that] they must render a verdict based solely on the evidence that they have heard and not upon speculation." The judge denied the defense request for this instruction.

Code of Criminal Procedure Article 36.14 requires the trial judge to give the jury a written charge "setting forth the law applicable to the case; not expressing any opinion as to the weight of the evidence, not summing up the testimony, discussing the facts or using any argument in his charge calculated to arouse the sympathy or excite the passions of the jury." This Court has held that jurors may not reach conclusions based on mere speculation or factually unsupported inferences or presumptions.[117] Thus, Davis's proposed charge arguably set forth the law applicable to the case.

The trial judge instructed the jury in pertinent part:

The jury is only permitted to receive evidence regarding the case from the witness

---

[113] 214 S.W.3d 9 (Tex. Crim. App. 2007).

[114] 254 S.W.3d 579 (Tex. App.—Amarillo 2008, no pet.)

[115] 653 S.W.2d 550, 553 (Tex. App.—Beaumont 1983, no pet.) (holding that the "jury may not reach a verdict based on speculation").

[116] No. 05-05-01379-CR (Tex. App.—Dallas July 20, 2006, no pet.) (not designated for publication).

[117] *See Hooper*, 214 S.W.3d at 15-16.

stand. During your deliberations, you are not to consider, refer to, or discuss any matters or issues not in evidence before you. You should not consider or mention any personal knowledge or information you may have about any fact or person not connected with this case which is not shown by the evidence . . . .

The charge also expressly instructed the jury that "conjecture . . . is to play no part in your deliberations."

Merriam-Webster Dictionary defines "speculation" as "ideas or guesses about something that is not known" and "conjecture" as "inference from defective or presumptive evidence . . . a conclusion deduced by surmise or guesswork."[118] Thus, the words "speculation" and "conjecture" have substantially the same meaning in this context—both involve making guesses about, or deriving conclusions from, presumptive facts or evidence. The trial judge's instructions cautioned jurors to consider only the evidence presented from the witness stand, to not consider any matters or opinions not in evidence in their deliberations, and to avoid engaging in "conjecture" in their deliberations. These instructions effectively communicated to the jury the same message that Davis requested—that the jury must base its verdict on the evidence presented to them from the witness stand and must not rely upon mere guesswork. As such, the judge's instructions were consistent with the prohibition we stated in *Hooper* against speculation or factually unsupported inferences or presumptions.[119] Moreover, defense counsel in his closing arguments explained to the jury the meaning of this language in the jury charge:

-----

[118] *See* "Speculation" and "Conjecture." Merriam-Webster.com. Merriam-Webster, n.d. Web. 7 Mar. 2016. *See also Hooper*, 214 S.W.3d at 16 ("Speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented.").

[119] *See Hooper*, 214 S.W.3d at 16 ("[J]uries are permitted to draw multiple reasonable inferences from the evidence (direct or circumstantial), but they are not permitted to draw conclusions based on speculation.").

Now, remember, [the prosecutor] stands up here and goes, "Well, why else? Why else?" That's guessing. You don't get to go back there and guess. Matter of fact, the charge says you can't use conjecture. We talked about it in voir dire; you don't get to speculate.

In addition, *King*, *Reese* and *Thomas*, as intermediate appellate court cases, are not binding authority for this Court.[120] Further, *Thomas* is an unpublished opinion which has no precedential value.[121] Moreover, *King* and *Reese* are distinguishable in that they are evidentiary sufficiency cases in which the reviewing courts held that a jury may not reach a verdict based on mere speculation. Those courts did not address a proposed jury charge like the one at issue here.[122] We overrule Davis's twenty-second point of error.

### PROSECUTOR'S CLOSING ARGUMENTS

In his twenty-third point of error, Davis complains about the following argument by the prosecutor:

He wants you to give him credit and find him guilty of the lesser included offense of murder. They keep bringing up the punishment range. They want you to think about the punishment range. Make you feel better about doing something that's not supported by what Franklin says [sic].

[Defense Counsel]: Judge, now I have to object. I think that's improperly striking at the defendant over counsel's shoulder and it shifts the burden.

---

[120] *See York v. State*, 342 S.W.3d 528, 537 n.31 (Tex. Crim. App. 2011) (stating that a case cited by appellant was not binding on this Court because it was a lower appellate court decision); *see also McQuarrie*, 380 S.W.3d at 153.

[121] *See* TEX. R. APP. P. 47.7(a) ("Opinions and memorandum opinions not designated for publication by the court of appeals under these or prior rules have no precedential value but may be cited with the notation, '(not designated for publication).'"); TEX. R. APP. P. 77.3 ("Unpublished opinions have no precedential value and must not be cited as authority by counsel or by court.").

[122] *See King*, 254 S.W.3d at 582; *Reese*, 653 S.W.2d at 553.

THE COURT: Fair reply. Overruled.
Ten minutes.

[The Prosecutor]: That's why they do that. They want you to look everywhere but [at] what happened on the shores of the Trinity River.

Davis contends that the above argument, made by the prosecutor in final closing arguments at the guilt-innocence phase of trial, improperly struck at him "over the shoulders of his counsel." He maintains that, if the prosecutor believed that defense counsel was attempting to mislead the jury regarding applicable principles of law, then he should have objected to defense counsel's argument when defense counsel stated it. He asserts that the State acted improperly in refraining from contemporaneously objecting to the defense argument at issue and then later accusing defense counsel of trying to mislead the jury. He argues the trial judge compounded the problem by overruling his objection. Davis refers this Court to *Fuentes v. State*[123] and *Gomez v. State*,[124] in which this Court found a prosecutor's closing arguments to be manifestly improper and harmful.

Davis also includes portions of our unpublished opinion in *York v. State*[125] largely verbatim in this point of error, yet he does not provide citation to *York* in the text of his brief or in his index of authorities. Such verbatim duplication of material from our unpublished opinion without proper citation to the case does not conform to our briefing requirements.[126] Nevertheless, in the interest

---

[123] 664 S.W.2d 333 (Tex. Crim. App. 1984).

[124] 704 S.W.2d 770 (Tex. Crim. App. 1985).

[125] No. PD-1753-06 (Tex. Crim. App. July 2, 2008) (not designated for publication).

[126] *See* TEX. R. APP. P. 38.1(i) (an appellant's brief . . . "must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record"); TEX. R. APP. P. 77.3 (unpublished opinions have no precedential value and must not be cited as authority).

of justice, we will address the merits of Davis's arguments.

This Court has stated that proper jury arguments generally falls with one of four areas: (1) summation of the evidence, (2) reasonable deductions from the evidence, (3) answers to an argument of opposing counsel, and (4) pleas for law enforcement.[127] "We have consistently held that argument that strikes at a defendant over the shoulders of defense counsel is improper."[128] A prosecutor "runs a risk of improperly striking at a defendant over the shoulder of counsel when the argument is made in terms of defense counsel personally and when the argument explicitly impugns defense counsel's character."[129]

We have indicated that prosecutors' remarks that defense counsel wanted to "mislead" the jurors "a little bit,"[130] lead them down a "rabbit trail," and cause them to lose focus on the defendant may be improper.[131] However, we have characterized prosecutorial remarks which criticize defense counsel's jury arguments or tactics, or the defendant's assertions during his testimony, as legitimate answers to opposing counsel's arguments and reasonable deductions from the evidence.[132] We have

---

[127] *Freeman v. State*, 340 S.W.3d 717, 727 (Tex. Crim. App. 2011).

[128] *Davis v. State*, 329 S.W.3d 798, 821 (Tex. Crim. App. 2010).

[129] *Id.* at 823 (citing *Mosley*, 983 S.W.2d at 259).

[130] *Dinkins v. State*, 894 S.W.2d 330, 357 (Tex. Crim. App. 1995) (finding that prosecutor's statement, that defense counsel "wants to mislead you a little bit," was improper because it "cast aspersion on defense counsel's veracity with the jury").

[131] *Mosley*, 983 S.W.2d at 258 (assuming that prosecutor's argument that, "The defense has attempted to get you off the main road, to divert you . . . . They want you to take a side road, a series of side roads, rabbit trails, and a rabbit trail that will lead you to a dead-end," was improper).

[132] *See, e.g.*, *Davis*, 329 S.W.3d at 823 (stating that the prosecutor's argument that the defendant was a con man trying to con the jury because he spent 4 hours on the witness stand was
(continued...)

distinguished these cases from those in which a prosecutor directly attacked the veracity or morals of defense counsel personally.[133] Although a prosecutor is permitted to respond to defense counsel's arguments and tactics, he "may not stray beyond the scope of the invitation."[134]

In this case, the prosecutor made the complained-of remarks in closing arguments at the guilt-innocence stage of trial. Prior to the prosecutor making these arguments, defense counsel, in his closing arguments, had discussed several matters in an apparent attempt to draw the jury's attention away from the facts of the murder and to evoke sympathy for Davis. For example, defense counsel informed the jury that Davis had learned gruesome details surrounding the murder of his mother when he was fourteen years old. Counsel discussed the allegedly flawed representation Davis received in the sexual-assault case, his loss of income, the holes in his "baby girl's" shoes because he could not provide for her, and the fact that he had been sexually assaulted as a child. Defense counsel further told the jury that Davis cooperated with police and freely admitted that he killed Gray, but he never admitted

---

[132](...continued)
a reasonable deduction from the evidence and an answer to the argument of opposing counsel); *Garcia v. State*, 126 S.W.3d 921, 925 (Tex. Crim. App. 2004) ("By telling the jury that defense counsel's arguments were 'hogwash,' i.e., nonsense, the prosecutor was merely stating, in colorful language, his opinion regarding the merits of defense counsel's arguments.").

[133] *See, e.g*, *Fuentes v. State*, 991 S.W.2d 267, 274 (Tex. Crim. App. 1999) (when the prosecutor argued that the defense attorney's cross examination of a State's witness was an effort to "[k]ill the messenger" and that the witness was "one of the strongest pieces of evidence against their client and they're bound to try to destroy him in front of you to save his neck," this Court held "the State's comments do not attack the veracity or morals of defense counsel but respond to the defense strategy of discrediting the State's key witness").

[134] *Brown*, 270 S.W.3d at 572 (noting that the prosecutor's argument was improper where he failed to limit himself to the misstatements of opposing counsel, and instead delved into matters outside the record and directly impugned the veracity of opposing counsel).

that he committed the sexual assaults against Gray or that he killed her to prevent her from testifying against him. Counsel argued that Davis would not have independently investigated Gray if he were guilty of the sexual assaults. Counsel said Davis was prepared and eager to go to trial on the sexual assault charges and "there was no reason for him to kill [Gray] to prevent her from going to court." Counsel urged the jury to find Davis guilty only of first-degree murder and not capital murder, because the State had not proven that his motive in murdering Gray was to keep her from testifying. He also informed the jury that they could give Davis "up to a life sentence" for murder.

The prosecutor's statements—that Davis "wants you to give him credit and find him guilty of the lesser[-]included offense of murder. They keep bringing up the punishment range. They want you to think about the punishment range"—were a direct response to defense counsel's arguments that urged that jury to choose the lesser-included offense of murder, attempted to inspire sympathy for Davis, and reminded the jury that Davis could receive a life sentence if convicted of murder. Similarly, the prosecutor's statement that the defense wanted the jurors to "feel better about doing something that's not supported by what [Davis] says" was a reasonable deduction from the evidence—including Davis's testimony—and a response to opposing counsel's arguments.

Davis testified at trial and admitted that he had created false text messages to offer in evidence at his sexual-assault trial and had lied in interviews. The prosecutor appears to have been attempting to communicate to the jurors that, despite defense counsel's arguments

urging sympathy for Davis and pressing the jury to consider the lesser offense, Davis's own statements demonstrated that he had been dishonest and was, in fact, so concerned about his upcoming trial that he was willing to try to intimidate the primary witness (Gray) and fabricate evidence. In other words, rather than impugning defense counsel's character, the prosecutor was suggesting that Davis himself lacked credibility.[135]

After the trial judge overruled defense counsel's objection, the prosecutor then stated, "That's why they do that. They want you to look everywhere but [at] what happened on the shores of the Trinity River." A logical interpretation of this comment was to suggest that Davis's attorneys were trying to misdirect the jury away from the facts of the murder that occurred on the shores of the Trinity River. Arguably, this remark improperly impugned defense counsel's veracity. But defense counsel did not renew his objection after the prosecutor made the Trinity River remark. Therefore, Davis did not properly preserve this particular complaint for our review.[136]

Even if any error regarding this remark had been properly preserved, it would have been non-constitutional error.[137] Thus, we would apply the harm standard set out in Texas

---

[135] *See Davis*, 329 S.W.3d at 823 (concluding that prosecutor's references to appellant as a con man who was trying to con the jury with his lengthy testimony was a reasonable deduction from the evidence and an answer to argument of opposing counsel; prosecutor did not strike over the shoulders of counsel, instead he directly attacked the credibility of appellant, who had testified).

[136] *See* TEX. R. APP. P. 33.1(a)(1).

[137] *Brown*, 270 S.W.3d at 572 n.2 (citing *Mosley*, 983 S.W.2d at 259).

Rule of Appellate Procedure 44.2(b). Rule 44.2(b) provides that a non-constitutional error "that does not affect substantial rights must be disregarded."[138] To determine if any error affected an appellant's substantial rights, we evaluate three factors: (1) the severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks); (2) the measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the judge); and (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction).[139]

The prosecutor's argument implying that the defense attorney was attempting to distract the jury, even if improper, was not particularly egregious when compared to the improper remarks that constituted reversible error in *Gomez* and *Fuentes*. In those cases, prosecutors accused defense attorneys of manufacturing evidence and of acting in "bad faith like usual."[140] We have held remarks similar to those at issue in this case, such as comments suggesting that defense attorneys were trying to confuse jurors or lead them down a "rabbit trail," were not harmful to defendants.[141] Further, the State's evidence in this case, including

---

[138] TEX. R. APP. P. 44.2; *Freeman*, 340 S.W.3d at 728.

[139] *Berry v. State*, 233 S.W.3d 847, 859 (Tex. Crim. App. 2007).

[140] *See Fuentes*, 664 S.W.2d at 335 (reversing verdict where prosecutor stated, "Oh, Judge, we object to that, he is in bad faith like usual and we object to it. That is a bunch of garbage and he knows it" and made other improper remarks about defense counsel); *Gomez*, 704 S.W.2d at 771 (reversing case where prosecutor said defense counsel brought someone down from Lubbock to manufacture evidence and was "paid to get this defendant off the hook").

[141] *See Mosley*, 983 S.W.2d at 258-60 (holding prosecutor's "rabbit trail" argument was not harmful to appellant, noting prosecutor did not directly accuse defense counsel of lying or

(continued...)

the extensive cell phone evidence, Davis's multiple confessions to killing Gray, and the fact that she was the only eyewitness against him on the pending sexual assault charges, was very strong. We overrule point of error twenty-three.

## PUNISHMENT CHARGE CLAIMS

In point of error twenty-five, Davis argues that the trial judge erred in overruling his objections to the punishment jury charge and in denying his requested punishment instructions. In over twenty sub-points, Davis outlines his complaints on constitutional and—frequently unspecified—legal grounds about various aspects of the trial judge's punishment charge. Davis concedes that this Court has previously addressed and rejected the legal issues he raises in these sub-points, but states that he is raising them here in order to preserve the issues for federal review. He also "moves this Court to reconsider prior rulings on each requested jury charge instruction [or] objection as it applies to the case at bar."

Davis does not provide us with any citations to the complained-of punishment jury instructions in the trial record, and refers us occasionally to "page [blank]" for the relevant charge language at issue in his sub-points. He also directs us to "Reporter's Record Vol. 3 pp. 174-189" for the relevant objections to the punishment charge. The third volume of the reporter's record in this case is only ten pages long, so we will assume that Davis means for

---

[141](...continued)
manufacturing evidence and did not inject new facts into the record); *Gallo v. State*, 239 S.W.3d 757, 767 (Tex. Crim. App. 2007) (holding, even if prosecutor's argument that defense attorney was trying to lead jurors down a "rabbit trail" was inappropriate, appellant was not harmed).

us to review pages 174-189 of the third volume of the clerk's record, where the "Defendant's Objections to the Charge at Punishment" can be found. Also, despite his motion for us to reconsider our prior rulings regarding all of the matters he raises in point of error twenty-five, he does not explain why we should do so. This point of error is multifarious and inadequately briefed, and we could reject Davis's claims on that basis alone.[142] However, in the interest of justice, we will address the specific arguments Davis sets out in his sub-points.

We have previously directly addressed and rejected the claims raised by Davis in sub-points (7)(a), (7)(d), (8), (11), (15), (16), and (17).[143] Davis has not included any argument

_____

[142] *See* TEX. R. APP. P. 38.1; *see also Davis*, 329 S.W.3d at 803 ("Because appellant bases his single point of error on more than one legal theory, his entire point of error is multifarious."); *Busby*, 253 S.W.3d at 673.

[143] *See Fuller v. State*, 253 S.W.3d 220, 234 (Tex. Crim. App. 2008) (rejecting complaint that the trial judge erred in not instructing the jurors to consider mitigating circumstances alone in determining whether a life sentence was warranted); *Mays v. State*, 318 S.W.3d 368, 397 (Tex. Crim. App. 2010) (rejecting defendant's claim that the trial judge's instruction that the jurors shall "consider all evidence . . . [t]hat militates for or mitigates against the imposition of the death penalty" unconstitutionally permits "vague and overbroad aggravators and other irrational procedures to impose capital punishment"); *Russeau v. State*, 291 S.W.3d 426, 435 (Tex. Crim. App. 2009) (when defendant argued that trial judge was required "to define the word 'militates' so as to preclude consideration of the defendant's age, race, sex, national origin, religion, political views or sexual orientation" as factors supporting a death sentence, this Court held, in part, "the trial court did not err in failing to define the term 'militates' . . . . we presume that jurors give it its usual meaning"); *Gamboa v. State*, 296 S.W.3d 574, 585 (Tex. Crim. App. 2009) (rejecting capital defendant's argument that trial judge erred in failing to instruct jury that a vote by one juror would result in a life sentence despite the statutory requirement of ten votes); *Resendiz v. State*, 112 S.W.3d 541, 549 (Tex. Crim. App. 2003) (noting that the Supreme Court has held Eighth Amendment does not require juries be informed of effect of failure to reach agreement on special issues); *Williams v. State*, 937 S.W.2d 479, 490 (Tex. Crim. App. 1996) (Article 37.071's requirement that ten or more jurors must agree in order to answer certain special issues "no" held not to violate the Unites States Constitution); *Nobles v. State*, 843

(continued...)

or authority explaining why this Court should overrule its prior holdings with regard to each of these particular claims. We decline to do so here.[144]

Despite his concession that we have previously addressed all of the claims in this point of error, Davis raises several claims that we have not previously directly addressed, although we have addressed similar arguments. In sub-point (1), he objects to the judge's use of the phrase "In order for the Court to assess proper punishment," alleging that this statement minimizes the jury's role and diminishes its sense of responsibility for the ultimate outcome of the case in violation of the Eighth, Eleventh, and Fourteenth Amendments to the United States Constitution. But the trial judge did not use the language in the court's charge or the judge's oral instructions to the jury, so Davis can show no error in this matter.

In sub-point (2), Davis complains that the trial judge instructed "each juror as if it he/she [sic] were one decision making body" when the jurors should be making individual decisions. Davis does not identify the specific language that he is complaining about in the

---

[143](...continued)
S.W.2d 503, 510 (Tex. Crim. App. 1992) (rejecting defendant's challenges to Article 37.071 sentencing scheme claiming the statute misleads jurors as to the effect of their individual votes and unconstitutionally prevents marginal jurors from holding out); *Blue v. State*, 125 S.W.3d 491, 501 (Tex. Crim. App. 2003) (stating that *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002), do not mandate the application of a beyond a reasonable doubt burden of proof to the mitigation issue because it cannot increase the penalty beyond the maximum the statute allows); *Coble v. State*, 330 S.W.3d 253, 296 (Tex. Crim. App. 2010) (rejecting appellant's argument that the trial judge should not have given the jury the statutory definition of mitigating evidence "as evidence that a juror might regard as reducing the defendant's moral blameworthiness"); *Wheatfall v. State*, 882 S.W.2d 829, 842 (Tex. Crim. App. 1994) (holding anti-sympathy charge did not violate Eighth or Fourteenth Amendments).

[144] *See* TEX. R. APP. P. 38.1; *Busby*, 253 S.W.3d at 673.

charge and does not explain how the judge's alleged focus on the jurors collectively violated any statutory or constitutional right. This claim is inadequately briefed.[145]

In sub-point (3), Davis contends that the trial judge should not have instructed the jury that it was to "determine" or "shall answer" the special issues because Article 37.071 does not require that each juror agree on the answers to the special issues. He urges us to hold that the jury instead be instructed using some form of the word "consider." He does not cite any constitutional right or legal authority supporting his position. Further, the trial judge instructed the jurors that they were not required to agree on what particular evidence supported a negative answer to the future dangerousness special issue or an affirmative answer to the mitigation special issue.[146] Sub-point (3) is inadequately briefed and lacks merit.[147]

In sub-point (4), Davis complains about the trial judge's instruction to the jurors that the "mandatory punishment for the offense of capital murder" is death or life imprisonment, arguing that the punishment alternatives should be referred to as "mandatory options." Again, he does not cite any constitutional right or legal authority supporting his position. Further, the court's punishment charge did not use the term "mandatory punishment," and

---

[145] See id.

[146] See TEX. CODE CRIM. PROC. art. 37.071, § 2(d), (f) (stating that "members of the jury need not agree on what particular evidence supports" their answers to the special issues); see also Resendiz, 112 S.W.3d at 549.

[147] See TEX. R. APP. P. 38.1; Busby, 253 S.W.3d at 673.

instead discussed the two sentences as "either-or" options: "You are instructed that the punishment for the offense of capital murder is either death or confinement in the Institutional Division of the Texas Department of Criminal Justice for life without parole." Thus, the record does not support Davis's claim.

In sub-point (5), Davis objects to the trial judge instructing the jurors that, in considering the special issues, they should consider "all evidence submitted to them in the whole trial." He argues that this instruction "incorrectly assumes" that all the evidence submitted in the guilt-innocence phase of trial is relevant to the punishment special issues. He cites no authority at all in this sub-point and, therefore, it is inadequately briefed.[148] Further, the trial judge instructed the jury in a manner consistent with Article 37.071.[149] Moreover, we have held that the jury is permitted to consider all the evidence admitted at the guilt-innocence phase of trial when considering the punishment special issues.[150]

In sub-point (6), Davis contends the trial judge erroneously failed to instruct the jury "that [his] directive to consider 'all of the evidence' set forth in the special issue regarding mitigation, controls over the definition of 'mitigating evidence' set forth elsewhere in the

---

[148] *Id.*

[149] TEX. CODE CRIM. PROC. art. 37.071, § 2(d) ("The court shall charge the jury that: (1) in deliberating on the issues submitted under Subsection (b) of this article, it shall consider all evidence admitted at the guilt or innocence stage and the punishment stage, including evidence of the defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty.").

[150] *Young*, 283 S.W.3d at 863; *see also Scheanette v. State*, 144 S.W.3d 503, 508 (Tex. Crim. App. 2004) ("[T]he statute requires the jury to look at all of the evidence and not just evidence a juror might consider to be mitigating.").

charge." Again, he does not cite any legal authority supporting his assertion that this additional instruction was necessary, and our case law does not support his argument.[151]

In sub-point (7)(b), Davis objects to the instruction that the jury should consider evidence that "militates for or mitigates against the imposition of the death penalty" because this instruction encourages jurors to disregard the special issues and return a general verdict based on their view of whether Davis deserved the death penalty. The trial judge instructed the jury as authorized by Article 37.071, and did not invite the jurors to render a general verdict.[152] Davis does not cite any constitutional right or legal authority supporting his position.[153]

In sub-point (7)(c), Davis objects to the instruction that the jury should consider evidence that "militates for or mitigates against the imposition of the death penalty" because Article 37.071 only authorizes the use of this instruction regarding the future dangerousness special issue and does not authorize the use of this instruction with respect to the jury's consideration of the mitigation special issue. However, the record does not support Davis's contentions, as the trial judge gave this instruction with regard to the jury's consideration of the future-dangerousness special issue, and not regarding the mitigation special issue.

---

[151] *See Cantu v. State*, 939 S.W.2d 627, 649 (Tex. Crim. App. 1997) ("Article 37.071[,] § 2(f)(4) does not unconstitutionally narrow the jury's discretion to factors concerning only moral blameworthiness as appellant alleges.").

[152] *See* TEX. CODE CRIM. PROC. art. 37.071, § 2(d).

[153] *See* TEX. R. APP. P. 38.1; *Busby*, 253 S.W.3d at 673.

In sub-point (9), Davis again objects to the proposed instruction that charges the jury that, in deliberating on the future-dangerousness special issue, it "shall consider the evidence of the Defendant's background or character or the circumstances of the offense." Davis contends that this instruction "permits and encourages each juror to nullify the terms and elements of the future dangerousness special issue[] (by using or even substituting background, character and the facts of the offense as aggravators)." The instruction complied with Article 37.071, § 2. The jury is entitled to consider the defendant's character, background, and the circumstances of the capital murder he committed in answering the future dangerousness special issue.[154] Further, the circumstances of the offense may be sufficient in egregious cases to sustain a "yes" answer to the future dangerousness special issue.[155]

In sub-point (10), Davis argues that the trial judge erred in wording the instructions so that the "death option" was always listed first, because this implied that death is the preferred or default punishment, when the default punishment is actually life imprisonment. Davis refers us to Texas Penal Code § 12.31(a), which provides: "[a]n individual adjudged guilty of a capital felony in a case in which the state seeks the death penalty shall be punished

---

[154] *See Young*, 283 S.W.3d at 863; *see also Gardner v. State*, 306 S.W.3d 274, 303 (Tex. Crim. App. 2009) (rejecting challenge to statutorily-mandated language that instructed the jury that it must consider "evidence of the defendant's background or character or circumstances of the offense" because we previously held jury must look at all the evidence and not just evidence that a juror might find to be mitigating).

[155] *See Young*, 283 S.W.3d at 863.

by imprisonment in the Texas Department of Criminal Justice for life without parole or by death."[156]  In this case, the trial judge's punishment charge informed the jury:  "You are instructed that the punishment for the offense of capital murder is either death or confinement in the Institutional Division of the Texas Department of Criminal Justice for life without parole."

Davis has not cited authority supporting his position that the trial judge's ordering of the two punishment options impermissibly implied that death was the default punishment. Elsewhere in the jury charge, the judge listed the life imprisonment option first:  "If you answer that a circumstance or circumstances warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed, the court will sentence the Defendant to imprisonment in the Institutional Division of the Texas Department of Criminal Justice for life without parole."  We find no merit to Davis's sub-point (10).[157]

In sub-point (12), Davis objects that the language in the punishment charge informing the jury that they "need not agree on what particular evidence" supported their answer to the future-dangerousness special issue was confusing.  He faults the trial judge for refusing to give the instruction he requested:  "None of you have to agree on why you vote "NO" on Special Issue No. 1 or why you vote "YES" on Issue No. 2 (the mitigation issue)."  In this

---

[156] TEX. PENAL CODE § 12.31(a).

[157] *See Russeau*, 291 S.W.3d at 436 (concluding that the trial judge complied with Article 37.071 in instructing the jurors and "[n]othing in our law required the trial court to further instruct the jury that there was 'no presumption in favor of death'").

case, the trial judge instructed the jury as to the future dangerousness special issue: "The members of the jury need not agree on what particular evidence supports a negative answer to Special Issue No. 1." The judge instructed the jury as to the mitigation special issue: "The members of the jury need not agree on what particular evidence supports an affirmative answer to Special Issue No. 2." These instructions complied with Article 37.071[158] and their content is essentially the same as the instruction Davis requested. Davis has not demonstrated that the trial judge's instruction was erroneous, nor that his proposed instruction was necessary. This sub-point is inadequately briefed and lacks merit.[159]

In sub-point (13), Davis objects to the trial judge's instruction that the State's proof must exclude "all reasonable doubt" because Article 37.071 and the Eighth Amendment require the State to prove the future-dangerousness special issue "beyond a reasonable doubt." Davis's punishment charge did not contain the phrase "all reasonable doubt" and instead instructed the jurors that the State's burden of proof on this special issue was "beyond a reasonable doubt." This sub-point is not supported by the record.

In sub-point (14), Davis complains that the trial judge did not give his requested instruction that each of the jurors, individually, must determine what "a reasonable doubt" means to him. He provides no argument or citation to authority or to the record supporting

---

[158] *See* TEX. CODE CRIM. PROC. art. 37.071, § 2(d), (f).

[159] *See* TEX. R. APP. P. 38.1.

this claim. This sub-point is inadequately briefed and lacks merit.[160]

In sub-point (18), Davis argues that the trial judge erred in failing to give an instruction he requested which would have forbidden jurors from bullying, harassing, or intimidating one another, required jurors to pass a note to the bailiff if any juror felt intimidated, and placed the foreperson in charge of preventing bullying among the jurors. Davis has not cited any legal authority mandating such an instruction; therefore, this claim is inadequately briefed.[161]

We overrule Davis's point of error twenty-five.

Davis does not include any specific claim or argument with regard to point of error twenty-six. This point is overruled due to inadequate briefing.[162]

In his twenty-seventh point of error, Davis argues that the trial judge erred in giving the jury the future-dangerousness special issue because the indictment did not allege that there was a probability that he would commit criminal acts of violence that would constitute a continuing threat to society. He cites four United States Supreme Court cases in support of this claim, but he provides no argument explaining the holdings or import of these cases.[163] This Court has previously rejected substantially similar claims that the future dangerousness

---

[160] *See id.*

[161] *See id.*

[162] *See id.*

[163] *Jones v. United States*, 526 U.S. 227 (1999); *Ring*, 536 U.S. 584; *Apprendi*, 530 U.S. 466; *Blakely v. Washington*, 542 U.S. 296 (2004).

special issue must be alleged in the indictment.[164]  Davis does not provide any argument or authority that persuades us to change our holding.  We overrule his twenty-seventh point of error.

Davis's point of error twenty-eight contains eleven sub-points alleging that the trial judge erred in failing to instruct the jury concerning the meaning of the word "probability," as used in the future-dangerousness special issue.  Each of the sub-points consists of approximately one sentence stating the claim.  None contain any citation to legal authority.  Thus, these claims are not adequately briefed.[165]  Also, we have rejected substantially similar arguments.[166]  We overrule point of error twenty-eight.

In point of error twenty-nine, Davis includes two sub-points objecting to the failure of the trial judge to instruct the jurors that the phrase "criminal acts of violence" in the future-dangerousness special issue means "serious criminal activity, causing serious bodily injury or death; not trivial, accidental, reckless, or highly provoked acts."  He also contends

---

[164] *See Estrada v. State*, 313 S.W.3d 274, 307 (Tex. Crim. App. 2010) (rejecting claim that court committed reversible error by denying appellant's objections to court's verdict form on ground that indictment did not allege special issue one); *Roberts v. State*, 220 S.W.3d 521, 535 (Tex. Crim. App. 2007) ("We have rejected this claim with respect to *Apprendi* and *Ring*, and *Blakely* does not appear to affect our rationale in doing so.").

[165] *See* TEX. R. APP. P. 38.1.

[166] *See Blue*, 125 S.W.3d at 504 (rejecting claims that "trial court violated various federal constitutional provisions by failing to instruct the jury that 'probability' in the 'future dangerousness' special issue 'meant a high probability, beginning at 95% and, if denied, then descending to a percentage no lower than 50%'"); *see also Earhart v. State*, 877 S.W.2d 759, 767 (Tex. Crim. App. 1994) (stating that the Court has repeatedly held that the terms "deliberately," "probability," "criminal acts of violence," and "continuing threat to society," contained in Article 37.071, require no special definitions).

that the trial judge should have instructed the jurors that "criminal acts of violence" does not include mere property crimes not combined with crimes involving serious bodily injury or death. We have decided these claims adversely to Davis's position and he does not offer any argument persuading us to change our stance on this issue.[167] We overrule point of error twenty-nine.

In his thirtieth point of error, Davis presents four sub-points concerning the phrase "continuing threat to society," as used in the future-dangerousness special issue. He complains that the trial judge denied his request to instruct the jury that "continuing threat to society" does not mean "any threat of harm or death, no matter how minor or remote, that might hypothetically be posted, in any place, in or out of prison, for any length of time after the jury verdict, no matter how short," and instead means "a clear and present threat of serious bodily injury or death to others while in prison, if serving a life sentence" or means he "will be so incorrigible that his acts of violence will continue throughout his life." He objects to the trial judge refusing to define "continuing threat to society" and "probability" so as to select only the "worst of the worst," because the failure to define the terms may be interpreted by jurors to imply that death is the preferred sentence, amounts to a comment on the weight of the evidence, and conditions the consideration of mitigating evidence upon the

---

[167] *See Blue*, 125 S.W.3d at 504 (overruling complaints about trial judge failing to instruct the jury that "criminal acts of violence" means "an act that resulted in serious bodily injury or death and not one that was trivial, accidental, reckless, or highly provoked acts" and does not mean "mere property crimes not in conjunction or combination with crimes against the person"); *see also Earhart*, 877 S.W.2d at 767.

determination of future dangerousness.

Davis offers no further argument in support of these assertions and no citation to legal authority. This point of error is not adequately briefed.[168] Further, we have consistently held that the terms "probability" and "continuing threat to society" do not necessitate special definitions.[169] Davis's point of error thirty is overruled.

In his thirty-first point of error, Davis presents four sub-points concerning victim-impact evidence and the future-dangerousness special issue. He argues that the trial judge erred in refusing to instruct the jury to not consider victim-impact evidence in connection with the future-dangerousness special issue; to hold the State to its burden of proving the future-dangerousness special issue beyond a reasonable doubt; to refrain from engaging in a comparative worth analysis; and to disregard victim-impact evidence that was not shown to be within Davis's knowledge or reasonable expectation. He cites *Will v. State*[170] and *Espada v. State*,[171] both of which are unpublished opinions and do not support his position.[172]

---

[168] *See* TEX. R. APP. P. 38.1; *Busby*, 253 S.W.3d at 673.

[169] *Druery v. State*, 225 S.W.3d 491, 509 (Tex. Crim. App. 2007) (citing *Earhart*, 877 S.W.2d at 767).

[170] No. AP-74,306 (Tex. Crim. App. Apr. 21, 2004) (not designated for publication).

[171] No. AP-75,219 (Tex. Crim. App. November 5, 2008) (not designated for publication).

[172] *See* TEX. R. APP. P. 77.3; *see also Will*, No. AP-74,306, slip op. at 19 (rejecting appellant's claims that he was entitled to additional beyond a reasonable doubt instruction regarding victim impact evidence, comparative worth analysis instruction, and instruction to disregard victim impact evidence not within appellant's knowledge or reasonable expectation) (citing *Jackson v. State*, 33 S.W.3d 828, 833-34 (Tex. Crim. App. 2000)); *Espada*, No. AP-

(continued...)

We have rejected substantially similar arguments in published cases.[173] Davis does not supply us with any further argument on this point or refer us to any special circumstances in his case that would justify deviating from our precedent.[174] We overrule his thirty-first point of error.

Davis raises nine sub-points in his thirty-second point of error focusing on the mitigation special issue. He argues the trial judge should have required the State to negate, beyond a reasonable doubt, the existence of a mitigating circumstance that would justify a life sentence. He complains that the judge did not provide a reasoned and rational moral process for considering mitigating circumstances because the judge provided no burden of proof or guidance to the jury on this issue. Davis further complains that the trial judge refused to grant his request to instruct the jurors that their finding of guilt in the first phase of the trial did not foreclose consideration of mitigating evidence. He objects that the reference to "sufficient mitigating circumstance or circumstances" is confusing because one circumstance is enough to merit a life sentence. He contends that the language asking

---

[172](...continued)
75,219, slip op. at 24-27 (denying appellant's claims that trial judge erred in refusing to: instruct jury not to consider victim impact evidence in connection with future dangerousness special issue; instruct jury to disregard victim impact evidence not within appellant's knowledge or reasonable expectation; give jury an additional beyond a reasonable doubt instruction regarding victim impact evidence; and instruct jury not to perform a comparative worth analysis).

[173] *See Mays*, 318 S.W.3d at 391 (citing *Saldano v. State*, 232 S.W.3d 77, 106-07 (Tex. Crim. App. 2007)) (rejecting claim of error based on the trial judge's denial of four requested instructions essentially the same as those requested here).

[174] *See* TEX. R. APP. P. 38.1; *Busby*, 253 S.W.3d at 673.

whether a circumstance warranted that a life sentence "rather than a death sentence be imposed" erroneously implied to each juror that a "yes" answer on the mitigation issue was required to "rescue" him from a death verdict that was already in place.  Davis additionally argues that the trial judge failed to provide a rational sentencing process because the phrase "personal moral culpability" as used in the mitigation special issue has the same meaning as the phrase "moral blameworthiness" used in the definition of mitigating evidence.  He maintains that the trial judge's directive to the jurors to consider "all the evidence" conflicts with the definition of mitigating evidence, citing *Penry v. Lynaugh*[175] and *Penry v. Johnson*.[176]  Finally, he objects to the punishment charge as a whole because it fails to permit a discretionary grant of mercy not tied to the requirements of the special issues.

Davis has included within this point of error multiple distinct legal arguments. Therefore, the entire point is multifarious and inadequately briefed.[177]  Further, in light of the fact that the trial judge instructed the jury in a manner consistent with the requirements set out in Article 37.071, §§ 2(e) and 2(f), our prior holdings do not support Davis's claims on any of his nine sub-points.[178]  Davis does not provide any reason for us to reconsider our

---

[175] 492 U.S. 302 (1989) (*Penry I*).

[176] 532 U.S. 782 (2001) (*Penry II*).

[177] TEX. R. APP. P. 38.1; *Davis*, 329 S.W.3d at 803.

[178] *See, e.g.*, *Coble*, 330 S.W.3d at 296-97; *Raby v. State*, 970 S.W.2d 1, 8 (Tex. Crim. App. 1998); *Rhoades v. State*, 934 S.W.2d 113, 128 (Tex. Crim. App. 1996).

position on these claims.[179] We overrule his thirty-second point of error.

In point of error thirty-three, Davis brings two sub-points complaining of the trial judge's failure to inform the jury of applicable law concerning the effect of a "holdout juror" and the fact that no mistrial will result from their deliberations. Davis argues that he may assert the jurors' right to equal protection of the law and due process for them, and the jurors' constitutional rights dictate that they should be informed of the legal effect of a holdout juror. Comparing this situation to the judicially-crafted nullification charge at issue in *Penry II*,[180] he argues that the jurors in his case were likely to give a false answer to the mitigation question "because a juror would feel it [was] impossible to convince nine (9) other jurors to vote with them." He further contends that the trial judge's charge concealed important information from the jurors and thereby violated the requirement in Article 36.14 that the judge give a charge that "distinctly" sets forth the "law applicable to the case," the "due course of law" clause of the Texas Constitution, and the Due Process Clause of the United States Constitution. He also refers us to *Simmons v. South Carolina*[181] with regard to this claim.

Article 36.14 requires the trial judge to deliver to the jury "a written charge distinctly setting forth the law applicable to the case; not expressing any opinion as to the weight of the

---

[179] *See Busby*, 253 S.W.3d at 673.

[180] 532 U.S. 782.

[181] 512 U.S. 154 (1994) (plurality op.).

evidence, not summing up the testimony, discussing the facts or using any argument in his charge calculated to arouse the sympathy or excite the passions of the jury." Article 37.071, § 2(a)(1) provides in relevant part that the trial judge, the defendant, and counsel "may not inform a juror or a prospective juror of the effect of a failure of a jury to agree" on the punishment special issues. In this case, the trial judge complied with this statutory requirement and refrained from informing the jury of the potential effect of a failure to agree. Davis has not shown that the judge improperly expressed any opinion as to the weight of the evidence, discussed the facts of the case, or used any argument "calculated to arouse the sympathy or excite the passions of the jury." Thus, he has not demonstrated that the trial judge violated Article 36.14.

We have repeatedly upheld the validity of the requirement in Article 37.071, § 2 that prohibits revealing to jurors the effect of capital jurors' failure to agree.[182] Davis's application of *Penry II* and *Simmons* to this statutory requirement combines constitutional arguments we have previously addressed, and does not persuade us to change our position on this matter. In *Penry II*, the Supreme Court held that a former supplemental "nullification instruction" directed capital jurors to return a false answer to one of the special issues and to ignore the verdict form instructions, if they found a mitigating circumstance that justified

---

[182] *See Prystash v. State*, 3 S.W.3d 522, 532 (Tex. Crim. App. 1999) ("There is no constitutional prohibition to concealing from the jurors the consequences of their deliberations so long as they are not misled into believing that ultimate responsibility for the verdict rests elsewhere.") (internal citations omitted); *Shannon v. State*, 942 S.W.2d 591, 600 (Tex. Crim. App. 1996) (noting that this Court has "previously addressed and rejected constitutional challenges" to this statutory language "on numerous occasions").

a life sentence.[183]  The Supreme Court emphasized that the sentencing jury must be provided with "a vehicle for expressing its reasoned moral response" to a defendant's mitigating evidence.[184]  In contrast, the complained-of statutory language did not require the jurors to disregard the court's instructions and give a false answer to a special issue.  Further, we have determined that the version of Article 37.071 under which Davis was tried provides a sufficient vehicle by which the jury can consider and give effect to mitigating evidence.[185]

In *Simmons*, the Supreme Court held that, where the jury must decide the question of future dangerousness, due process principles require a sentencing jury to be informed when a defendant is ineligible for parole.[186]  Under South Carolina law, Simmons could never be released on parole, and yet the trial judge prohibited the defense from revealing that fact to the jury and thereby prevented the defense from rebutting information the sentencing authority considered in imposing his death sentence.[187]  Davis's punishment charge correctly informed the jury that Davis was "ineligible for release on parole."  The instruction at issue did not prevent him from rebutting the State's evidence.  Point of error thirty-three is overruled.

The heading of Davis's thirty-fourth point of error refers to "*Jones*, *Apprendi*, *Ring*

---

[183] *Penry II*, 532 U.S. at 799-800.

[184] *Id*. at 797.

[185] *Threadgill v. State*, 146 S.W.3d 654, 671 (Tex. Crim. App. 2004).

[186] *Simmons*, 512 U.S. at 169.

[187] *Id*. at 165.

and *Blakely*," but Davis does not provide citation to—or explain the importance of—these four cases. He argues that the trial judge erred in failing to include a verbatim copy of the indictment in the jury charge and failing to instruct the jury to disregard any fact militating in favor of death that was not alleged in the indictment. He also contends that the judge should not have submitted the future-dangerousness special issue to the jury because the indictment did not allege a probability that Davis would commit criminal acts of violence that would constitute a continuing threat to society. The majority of the arguments contained in this point of error echo those raised in Davis's twenty-seventh point of error, which we have overruled.[188] Davis does not provide any additional argument or authority that persuades us to alter our position. In addition, Davis does not provide any argument or authority substantiating his claim that the trial judge erred in failing to include a verbatim copy of the indictment in the punishment jury charge.[189] We overrule his thirty-fourth point of error.

In his thirty-fifth point of error, Davis complains that the trial judge erroneously refused to grant his request to instruct the jury that: there is no presumption in favor of death; even if they were to find him to be a "future danger," state law presumes life; and the law is always satisfied with a life verdict. We have previously held that trial judges did not

---

[188] *See Estrada*, 313 S.W.3d at 307 (rejecting claim that trial judge erred in denying objections to verdict form on ground that indictment did not allege special issue one); *Roberts*, 220 S.W.3d at 535 (rejecting this claim with respect to *Apprendi, Ring*, and *Blakely*).

[189] *See* TEX. R. APP. P. 38.1; *Busby*, 253 S.W.3d at 673.

err in rejecting similar requests.[190] Point of error thirty-five is overruled.

Davis argues points of error thirty-six and thirty-seven together because they "involve the same issues of law and are similar in nature." Incorporating his trial counsel's motions "as if set out verbatim," Davis argues that the trial judge erred in unconstitutionally limiting the jury's consideration of mitigating evidence to factors that reduce the defendant's "moral blameworthiness."[191] He refers us to *Tennard v. Dretke*,[192] which holds that relevant mitigating evidence is "evidence which tends logically to prove or disprove some fact or circumstance which a fact finder could reasonably deem to have mitigating value." He acknowledges that this Court has previously rejected his arguments.[193] He requests that we review these issues again and reverse our position, but he provides no new argument or authority in support of his request. Further, he does not explain how the jury instructions that were given in this case prevented the jury from giving effect to any of his mitigating evidence.[194] Without more, we decline to overrule our precedent. We overrule these points

---

[190] *See Russeau*, 291 S.W.3d at 436 (holding that "[n]othing in our law" required the trial judge to instruct the jury that "there is no presumption in favor of death"); *Saldano*, 232 S.W.3d at 106 (rejecting argument that trial judge erred in failing to instruct the jury that there is no presumption in favor of death).

[191] *See* TEX. CODE CRIM. PROC. art. 37.071, § 2(f)(4) (mandating definition of mitigating evidence that trial judge must give to the jury).

[192] 542 U.S. 274 (2004).

[193] *See Roberts*, 220 S.W.3d at 534.

[194] *See id.* ("Moreover, appellant does not explain how the jury instructions that were given prevented the jury from giving effect to any of his alleged mitigating evidence, and we

(continued...)

of error.

## ADDITIONAL CONSTITUTIONAL ISSUES

Davis's remaining points of error raise constitutional issues that he concedes "have been previously submitted to this Honorable Court; which previously has overruled the issues raised." Davis notes that he raised these arguments at trial via written pretrial motions, which the trial judge denied. These points of error include the following claims:

Point of Error 38. Error in denying pretrial motion asking trial judge to find Article 37.071, § 2(f)(4) unconstitutional;

Point of Error 39. Error in denying pretrial motion to declare the "10-12 Rule" unconstitutional;

Point of Error 40. Error in denying pretrial motion to find Article 37.071 unconstitutional as applied to Davis;

Point of Error 41. Error in denying pretrial motion to declare Article 37.071 unconstitutional because it allows juries to decide future dangerousness based solely on the facts of the case;

Point of Error 42. Error in denying pretrial motion to preclude death as a sentencing option and to declare Article 37.071 unconstitutional because of jurors' inability to predict future dangerousness;

Point of Error 43. Error in denying pretrial motion to declare Article 37.071 unconstitutional because it has become a *de facto* mandatory death penalty statute;

Point of Error 44. Error in denying pretrial motion to find that the death penalty is unconstitutional in the State of Texas because the capital sentencing procedure fails to meet the minimum requirements set forth in *Furman v.*

---

[194](...continued)
perceive no barrier to the jury doing so.").

*Georgia*[195] and its progeny;

Point of Error 45. Error in denying pretrial motion to declare Article 37.071, § 2(a) unconstitutional on its face under due process and due course of law principles;

Point of Error 46. Error in denying pretrial motion to declare Article 37.071, § 2(a) unconstitutional on its face for lack of standards;

Point of Error 47. Error in denying pretrial motion to hold statutory definition of mitigating evidence unconstitutional as applied because it imposes a "nexus" limitation and to grant Davis's requested voir dire, instruction, argument, and motion in limine; and

Point of Error 48. Error in denying pretrial motion to preclude the death penalty as a sentencing option due to a denial of equal protection.

Davis's statement that we have previously overruled these claims is correct.[196]  He

---

[195] 408 U.S. 238 (1971).

[196] *See, e.g.*, *Coble*, 330 S.W.3d at 296 (finding no "nexus" requirement in the statutory definition of mitigating evidence); *Martinez v. State*, 327 S.W.3d 727, 740 (Tex. Crim. App. 2010) ("This Court has also consistently held that the circumstances of the offense itself, if severe enough, may be sufficient to support an affirmative finding to the future dangerousness special issue . . . .  Appellant's arguments do not persuade us to reconsider our prior decisions upholding the constitutionality of the Texas death penalty scheme."); *Gamboa*, 296 S.W.3d at 585 (rejecting claim that "trial court erred when it denied [appellant's] motion to preclude the death penalty as a sentencing option due to equal protection violations"); *Saldano*, 232 S.W.3d at 108 (rejecting claim of error in overruling motion to set aside indictment "as being unconstitutional based on the enumerated constitutional defects of the Texas capital murder death penalty law"); *Woods v. State*, 152 S.W.3d 105, 121 & n.66 (Tex. Crim. App. 2004) (rejecting claim that statutory mitigation special issue gives the jury unfettered discretion and permits the arbitrary and capricious imposition of the death penalty); *Escamilla v. State*, 143 S.W.3d 814, 828 (Tex. Crim. App. 2004) (rejecting claims that the "12/10 rule" violates various federal constitutional provisions); *Cantu*, 939 S.W.2d at 649 (holding Article 37.071, § 2(f)(4) does not unconstitutionally narrow the jury's discretion to factors concerning only moral blameworthiness); *Green v. State*, 912 S.W.2d 189, 196-97 (Tex. Crim. App. 1995) ("[O]ur capital sentencing scheme passes constitutional muster with respect to the 'eligibility decision.'"); *McBride v. State*, 862 S.W.2d 600, 611 (Tex. Crim. App. 1993) (rejecting argument

(continued...)

professes his intent to preserve these issues for federal review and invites us to review our prior stance on these issues. However, he merely incorporates the claims raised in his pretrial motions by reference without offering any additional argument explaining why we should change our position on these issues. Therefore, he has inadequately briefed these points.[197] Further, we decline to overturn our precedent. Davis's thirty-eighth through forty-eighth points of error are overruled.

We affirm the trial court's judgment.

DELIVERED: November 2, 2016

DO NOT PUBLISH

---

[196](...continued)
that Texas's death penalty statute violates Eighth and Fourteenth Amendments because probability that one will commit future acts of violence is impossible to predict).

[197] *See* TEX. R. APP. P. 38.1.